2005-NMCA-009

104 P.3d 1104

**Vivian CORDOVA, Plaintiff–Appellant,**

v.

**STATE of New Mexico, TAXATION AND REVENUE, PROPERTY TAX DIVISION, Bernalillo County Treasurer's Office, W & P Real Estate, Inc., Defendants–Appellees.**

**No. 23,625.**

Court of Appeals of New Mexico.

Dec. 1, 2004.

Reggie C. Chavez, Belen, NM, Rudy A. Ortiz, Rudy A. Ortiz & Associates, P.C., Albuquerque, NM, for Appellant.

Patricia A. Madrid, Attorney General, Bridget Jacober, Special Assistant Attorney General, NM Taxation & Revenue Department, Santa Fe, NM, for Appellee Property Tax Division.

Tito D. Chavez, Bernalillo County Legal Department, M. David Chacon, II, Assistant Bernalillo County Attorney, Albuquerque, NM, for Appellee Bernalillo County Treasurer's Office.

Floyd D. Wilson, McCary, Wilson & Pryor, Albuquerque, NM, for Appellee W & P Real Estate, Inc.

## OPINION

ALARID, Judge.

{1} This is an appeal from the district court's dismissal with prejudice of a complaint to set aside a tax deed. We find no error and affirm the orders granting summary judgments to Defendants.

## BACKGROUND

{2} Plaintiff–Appellant, Vivian Cordova (Cordova), and his wife Diana, purchased as joint tenants five acres of land located just west of the intersection of Central Avenue and 98th Street in Albuquerque, New Mexico (the Property). The Cordovas divorced in 1991. They continued to hold the Property as joint tenants.

{3} At all material times, Cordova received his mail at a residence on La Cabra Drive in Southeast Albuquerque owned by one of Cordova's brothers. Cordova considered the La Cabra Drive residence his home. Cordova and his brother, Arturo, were the only persons living at the La Cabra Drive residence. In late September 1995, the Property Tax Division of the New Mexico Taxation and Revenue Department (the PTD) sent to the La Cabra Drive address a "Notice of Sale of Real Property" stating that taxes on the Property for 1991 and subsequent years were delinquent and that the Property would be sold at a public auction on October 24, 1995, unless the Cordovas paid or entered into an installment agreement for the payment of taxes, penalties, and interest in the amount of $7,819.03. Thereafter, Cordova met with Art Kavanaugh, a senior tax researcher with the Bernalillo County Treasurer's Office (the BCTO). Cordova and Kavanaugh reached an agreement pursuant to which Cordova would make an initial payment of $3,922.02 by October 20, 1995. Cordova further agreed to pay the remaining balance together with the 1995 taxes by May 10, 1996. In return, the PTD would withhold the Property

from auction. This agreement is documented in an October 20, 1995, letter from the BCTO to Cordova. On October 20, 1995, Cordova's brother tendered a cashier's check for $3,922.02 payable to the Bernalillo County Treasurer. There is no evidence that Cordova or anyone acting on his behalf made a second payment as contemplated by Cordova's agreement with Kavanaugh.

{4} In June 1997, the Bernalillo County Treasurer sent a bill for property taxes to Cordova at the La Cabra Drive address. The bill stated that:

> The 1994 property taxes for this property became delinquent Dec 10, 1994 for the first half and May 10, 1995 for the second half. They now have been delinquent for more than two years. If payment is not made directly to the County Treasurer by June 30, 1997, the property will be transferred to New Mexico Property Tax Division for collection. The State will then offer this property at public sale in 1998.

> After July 1, 1997 you must pay all delinquent taxes to prevent tax sale action. All taxes due are listed below. The Treasurer's Office will only accept cash, cashier's check or money order as payment of 1994 taxes. Personal checks will not be accepted.

The bill showed taxes, penalties, and interest in the following amounts: $1,016.17 owed for 1993; $935.54 owed for 1994; $836.50 owed for 1995; and $763.33 owed for 1996, for a total liability of $3,551.54. Cordova concedes that he received the June 1997 bill.

{5} In early August 1997, Cordova met with Kavanaugh and two representatives from the PTD. Kavanaugh recalled that Cordova was told that the taxes had to be paid by September 30, 1997, to avoid a tax sale. In contrast, Cordova recalled that Kavanaugh or one of the PTD representatives wrote on a tax notice that the taxes had to be paid by October 1, 1997, to prevent the Property from "going to the state," and that nothing was said about an impending tax sale. Cordova claimed that he subsequently lost the notice with the handwritten notations

when a friend cleaned out his vehicle as a favor.

{6} On August 29, 1997, the PTD sent by certified mail, return receipt requested, a "Notice of Sale of Real Property" to Cordova and Diana at their separate addresses. The notices stated that the Property would be sold on September 30, 1997, at a public auction unless $3,670.97, representing taxes, penalties, and interest for 1993 and subsequent years was paid to the Bernalillo County Treasurer.

{7} Diana received her notice, which had been mailed to her mother's address and forwarded to her. Diana decided to take no action and to allow the tax sale to proceed. She did not discuss the notice with Cordova.

{8} Cordova concedes that his copy of the August 29, 1997, notice was mailed to him at his correct address. There was undisputed evidence that the post office made two, possibly three, attempts to deliver the letter to the La Cabra Drive address.[1] At some point prior to the tax sale, the envelope containing Cordova's copy of the August 29, 1997, notice was returned to the PTD as unclaimed with the unsigned return receipt still attached. At his deposition, Cordova admitted that either he or his brother would have picked up any mail delivered to the La Cabra Drive address during August and September 1997. Cordova was certain that if his brother had picked up a notice of certified mail, he would have told Cordova.

{9} Cordova recalled that he sent one of his brothers to the BCTO on September 29 and 30, 1997, with a check for the full amount due, and that on both occasions Cordova's brother could not find Kavanagh, and left. Cordova himself stopped by the BCTO on October 1, 1997, with the check, but was told it was too late: the Property had been sold the previous day.

{10} On October 23, 1997, Cordova filed a Complaint to Set Aside Tax Deed, naming the PTD and the BCTO as defendants. In his complaint, Cordova admitted that he had had actual knowledge that property taxes on the Property were delinquent. Cordova asserted that he had been misled by the June 1997 notice stating that the Property would be offered for sale in 1998 and by alleged assurances during the August 1997 meeting that Cordova had until October 1, 1997, to pay delinquent taxes. Cordova further alleged that the PTD had not provided him with proper notice in violation of NMSA 1978, § 7–38–66 (1990) (amended 2001) and the United States and New Mexico constitutions. Cordova claimed that he had been deprived of property having a fair market value of $800,000. Cordova prayed that the tax deed be set aside; that Defendants be required to accept payment of delinquent property taxes; and, for such further relief as the district court might deem proper.

{11} In January 1998, Cordova filed an amended complaint joining W & P Real Estate, Inc. (W & P), the entity to which Floyd Wilson had transferred the Property following Wilson's purchase of the Property at the September 30, 1997, tax sale. In his amended complaint, Cordova prayed that the tax deed be set aside; that W & P be reimbursed by the State; that the PTD and the BCTO be ordered to accept Cordova's tender of payment for property tax delinquencies; and, for such other further relief as the court may deem just and proper.

{12} In a series of summary judgments, the district court dismissed the complaint as to W & P, the BCTO, and the PTD.

## DISCUSSION

### 1. Summary Judgment as to W & P Real Estate

{13} W & P was the first Defendant to file a motion for summary judgment. In its memorandum in support of its motion, W & P asserted that there were no genuine issues of material fact as to any ground for

---

1. Handwritten notations on the envelope containing the notice that apparently were made by post office personnel indicate that the post office took action on August 30, September 8, and September 14, 1997. We take judicial notice of the fact that September 14, 1997 fell on a Sunday.

setting aside a tax deed. In his response, Cordova argued that there were genuine issues of material fact as to two grounds for invalidating the sale of the Property: prior payment and lack of notice. The district court rejected Cordova's arguments and granted summary judgment in favor of W & P.

### a. Prior Payment

{14} An appeal from a district court's order determining that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law, Rule 1–056(C) NMRA, presents a question of law, subject to de novo review. *Bartlett v. Mirabal*, 2000–NMCA–036, ¶ 4, 128 N.M. 830, 999 P.2d 1062.

{15} At the time of the tax sale, Section 7–38–66(E) (1990)[2] provided that "[p]roof by the taxpayer that all delinquent taxes, penalties, interest and costs had been paid prior to the date of sale shall prevent or invalidate the sale." In support of his claim of prior payment, Cordova attached an affidavit and two pages of deposition testimony. In his affidavit, Cordova stated:

2. [O]n October 20, 1995, the Bernalillo County Treasurer's Office received a cashier's check in the amount of $3,922.02, for payment of back taxes 1990 thru 1995[.]

3. It is my understanding that the cashier's check of October, 1995, in the amount of $3,922.02, brought my taxes current thru 1995 leaving an undue balance of $764.90, for tax year 1996[.]

Cordova's deposition testimony contained similar assertions that Cordova had brought his taxes current by making a $3,922.02 payment to the BCTO on October 20, 1995. Cordova also attached to his response a photocopy of a cashier's check dated October 20, 1995, in the amount of $3,922.02 payable to the Bernalillo County Treasurer; a copy of the September 1995 tax bill advising the Cordovas that they owed $7,819.03 in back taxes, penalties, and interest; and a copy of the October 20, 1995, letter from the BCTO to Cordova documenting Cordova's agreement to make an initial payment of $3,922.02 by October 20, 1995, and to pay the remaining taxes, including 1995 taxes, by May 10, 1996.

{16} We agree with W & P that Cordova's unilateral understanding that the initial payment of $3,922.02 brought his taxes current through 1995 is inconsistent with the agreement documented in the October 20, 1995, letter, which required Cordova to make a second payment by May 10, 1996. As W & P correctly observed in its reply in support of its motion for summary judgment, the initial payment of $3,922.02 corresponds to $7,819.03 (the amount of accrued taxes, penalties, and interest) plus $25.00 (the amount of an additional monthly penalty for late payment) divided by two. There is no evidence of the second payment contemplated by the installment agreement documented in the October 20, 1995, letter from the BCTO. In the face of documentary evidence establishing that the $3,922.02 payment corresponded to payment of one-half of his delinquent taxes, penalties, and interest, Cordova's self-serving testimony as to his subjective belief that he had paid his taxes for 1994 and 1995 was insufficient to create a genuine issue of material fact as to prior payment.

### b. Notice

{17} Whether the PTD provided Cordova with adequate notice is a question of law, which we review de novo. *See Patrick v. Rice*, 112 N.M. 285, 290, 814 P.2d 463, 468 (Ct.App.1991) (observing that after evidentiary hearing on adequacy of notice of tax sale, appellate court defers to district court's findings that are supported by substantial evidence, but independently reviews the legal effect of the facts so established). Because the question of notice was resolved by summary judgment, rather than by an evidentia-

---

2. We apply the property tax law in effect at the time of the tax sale. *Hoffman v. N.M. Taxation &* *Revenue Dep't,* 117 N.M. 263, 264, 871 P.2d 27, 28 (Ct.App.1994).

ry hearing, we review the record under the standards summarized in *Bartlett*, 2000–NMCA–036, ¶¶ 4, 7, 128 N.M. 830, 999 P.2d 1062, to determine whether the district court correctly determined that there were no genuine issues of material fact precluding summary judgment.

### c. Statutory Notice

{18} The Property Tax Code required the PTD to send Cordova notice of the tax sale "by certified mail, return receipt requested, to the address as shown on the most recent property tax schedule." Subsection 7–38–66(A) (1990). The Property Tax Code further provided that:

> Failure of the department to mail a required notice by certified mail, return receipt requested, shall invalidate the sale: provided, however, that return to the department of the notice of the return receipt shall be deemed adequate notice and shall not invalidate the sale.

Subsection 7–38–66(D) (1990). Subsection 7–38–66(D) as amended in 1990 is a substantial simplification of this subsection as originally enacted in 1973; and, we believe, was intended to legislatively overrule the Supreme Court's decision in *State ex rel. Klineline v. Blackhurst*, 106 N.M. 732, 749 P.2d 1111 (1988).

{19} In *Klineline*, the PTD had sent a notice by certified mail to the taxpayers' residence, which was the address shown on the most recent tax schedule. *Id.* at 734, 749 P.2d at 1113. The envelope containing the notice, stamped "unclaimed," and the unsigned return receipt form were returned to the PTD by the post office. *Id.* After the property was sold at a tax sale, the taxpayers resisted efforts to eject them from their residence, challenging the validity of the sale on the ground of inadequate notice.

{20} The pre–1990 version of the Property Tax Code in effect at the time provided that:

> Failure of the division to mail the notice by certified mail, return receipt requested, *or* failure of the division to receive the *return receipt* shall invalidate the sale; *provided, however,* that the receipt by the division of a return receipt indicating that the taxpayer *does not reside at the address shown* on the most recent property tax schedule shall be deemed adequate notice and *shall not invalidate the sale.*

*Id.* at 735, 749 P.2d at 1114 (quoting NMSA 1978, § 7–38–66(C) (1973)). The Supreme Court held that the PTD's receipt of the return receipt form without a signature showing that it had been accepted by or on behalf of the taxpayers amounted to a "failure of the division to receive the return receipt," *id.* at 736, 749 P.2d at 1115, and that a return receipt form stamped unclaimed by the post office was not equivalent to "a return receipt indicating that the taxpayer does not reside at the address shown," *id.* at 737, 749 P.2d at 1115. The Supreme Court held that the PTD had not substantially complied with the notice requirement of Section 7–38–66(C), currently Section 7–38–66(D), and that the tax sale was therefore invalid. The 1990 amendment eliminated the specific language relied upon by the Supreme Court in invalidating the sale in *Klineline*. As we read Section 7–38–66 as amended in 1990, the PTD's receipt of the notice of return receipt "shall be deemed adequate notice" as long as the notice of the tax sale was mailed in compliance with Subsection 7–38–66(A). The fact that the notice of receipt form was not signed by or on behalf of the taxpayer or that the notice of the tax sale was returned marked unclaimed rather than indicating that the taxpayers no longer reside at the address of record is no longer dispositive of the adequacy of statutory notice.

{21} There is no dispute that the PTD mailed a notice of the tax sale to Cordova at his residence, which was "the address as shown on the most recent property tax schedule." Under the 1990 version of Section 7–38–66(E), which was in effect at the time of the tax sale, the fact that the post office returned the envelope containing this notice to the PTD stamped "unclaimed" and with an unsigned return receipt does not invalidate the subsequent tax sale. The dis-

trict court correctly determined that there were no genuine issues of material fact as to the question of the PTD's compliance with statutory notice requirements. The August 29, 1997, notice mailed to Cordova at his address of record constituted statutorily adequate notice even though it was returned marked unclaimed.

### d. Due Process Notice

 {22} Apart from satisfying statutory notice requirements, notice of a tax sale must provide constitutionally adequate notice to the delinquent taxpayer. *E.g., Hoffman,* 117 N.M. at 268, 871 P.2d at 32. To satisfy due process, notice must be given in a manner "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Efforts at effecting notice to absent parties should "be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.* at 315, 70 S.Ct. 652.

{23} Some courts measure the adequacy of mailed notice by considering only those circumstances known to the sender *as of the date of the initial mailing. E.g., Sarit v. DEA,* 987 F.2d 10, 14 (1st Cir.1993) (observing that "[k]nowledge of the likely effectiveness of the notice is measured from the moment at which the notice was sent"). Under this approach, the subsequent return of mailed notice as undeliverable or unclaimed does not affect the constitutional adequacy of the notice. *Id.* at 14. Other courts read *Mullane's* phrase "under all the circumstances," to extend to circumstances occurring after the original mailing. Under this approach, the return of mailed notice as undeliverable or unclaimed is a factor in decid-

ing whether the sender utilized a method of notice "reasonably calculated, under all the circumstances, to apprise interested parties," 339 U.S. at 314, 70 S.Ct. 652. *E.g., Small v. United States,* 136 F.3d 1334 (D.C.Cir.1998); *Jones v. Grieg,* 829 A.2d 195, 199–200 (D.C. 2003) (characterizing return of notice as unclaimed as a "red flag"). To our knowledge, the United States Supreme Court has not decided a case that turned upon the application of *Mullane* to mailed notice which has been returned to the sender.

{24} We consider it significant that *Mullane's* endorsement of service by mail occurred in a context where there were numerous parties who were similarly-situated. The Supreme Court emphasized that:

> [t]he individual interest does not stand alone but is identical with that of a class. The rights of each ... are shared by many other beneficiaries. Therefore notice reasonably certain to reach most of those interested ... is likely to safeguard the interests of all.... We think that under such circumstances reasonable risks that notice might not actually reach every beneficiary are justifiable.

339 U.S. at 319, 70 S.Ct. 652. Where, as here, the class of persons whose interests will be affected consists of one or two individuals, *Mullane's* rationale that "notice reasonably certain to reach most of those [likely to be affected] is likely to safeguard the interests of all," is not at all compelling. *Id.* While it may have been possible in *Mullane* to judge the adequacy of notice to *a class of similarly-situated parties* as of the date of the mailing, we do not think that it is possible in every case to determine the adequacy of notice by mail without regard to subsequent events such as the return of the notice as unclaimed or undeliverable.[3] Thus, we reject a per se rule that examines the adequacy of notice solely by reference to the information

---

3. The United States Postal Service has written guidelines governing non-delivery of mail. *See generally* USPS, *Domestic Mail Manual* ¶ F010 (Issue 58, updated 10–14–04). The Domestic Mail Manual can be accessed online at http://www.usps.com/publications/manuals/wel-

com.htm. By way of example, mail is endorsed "Unclaimed" when the addressee has abandoned or failed to call for mail, while mail is endorsed "Attempted—Not Known" when delivery has been attempted, but the addressee is not known at the place of address.

available to the sender as of the date of mailing. Instead,

> [w]e believe the correct approach is a fact-specific analysis under the due process standard set forth by the Supreme Court in *Mullane*, which requires us to consider all the circumstances of each case to determine whether the notice provided is reasonably calculated to apprise the [affected party] of the impending proceeding.

*Garcia v. Meza*, 235 F.3d 287, 291 (7th Cir. 2000).

{25} We also reject W & P's argument that we should apply a per se rule that notice to one joint tenant, constitutes constitutionally adequate notice to other joint tenants. Under the Property Tax Code, property taxes are personal obligations of the persons owning the property and a personal judgment may be rendered against the owners for delinquent taxes. NMSA 1978, § 7–38–47 (1973). However, "[a] sale properly made under the authority of and in accordance with the requirements of [the Property Tax Code] constitutes full payment of all delinquent taxes, penalties and interest that are a lien against the property at the time of the sale." NMSA 1978, § 7–38–67(E) (1999) (amended 2001). It is clearly foreseeable that by the time property is turned over to the PTD for sale, joint tenants may have divergent interests: one tenant may be satisfied to have the property sold, thereby discharging any past tax liability and foreclosing future liability, while another tenant may wish to pay the taxes and retain the property. The fact that two or more taxpayers are co-tenants is merely one circumstance that may be considered in determining whether notice was constitutionally adequate; however, it is not of itself dispositive of the constitutional adequacy of notice.

{26} In the district court, W & P moved for summary judgment arguing in the alternative that (1) Cordova had actual knowledge of the September 30, 1997, sale, or (2) the PTD had provided constitutionally adequate notice when it mailed the notice to Cordova's correct address. In its Answer Brief in this Court, W & P has not addressed Cordova's argument that a genuine issue of material fact existed as to Cordova's lack of actual notice. We therefore deem W & P to have abandoned the argument that the summary judgment can be sustained on the ground that there was no genuine issue of material fact as to Cordova's receipt of actual notice. We therefore focus on whether W & P was entitled to summary judgment on the question of constitutionally adequate notice.

{27} W & P included the following paragraphs in its statement of undisputed material facts:

> 7. The Notice of Tax Sale which was sent to Plaintiff Vivian Cordova, was mailed, by certified mail, return receipt requested to Vivian Cordova, at 1500 La Cabra S.E., Albuquerque, New Mexico 87123[.]
>
> 8. As of August–September, 1997, the Plaintiff, Vivian Cordova resided at 1500 La Cabra S.E., Albuquerque, New Mexico 87123, and received his mail at that address.
>
> 9. The Plaintiff, Vivian Cordova, either failed or refused to accept delivery of the certified letter which contained the [August 29, 1997] Notice of Tax Sale; and such letter was ultimately returned to the Property Tax [D]ivision marked "unclaimed."

(Citations to the record omitted).

{28} Cordova did not dispute the facts set out in paragraphs 7–9 of W & P's statement of material facts. Pursuant to Rule 1–056(D), those facts were deemed admitted. We hold that these facts were sufficient to establish a prima facie case of entitlement to summary judgment on the question of the adequacy of notice. Therefore, the burden of production shifted to Cordova to establish a genuine issue of material fact as to the constitutional adequacy of notice. *See Blauwkamp v. Univ. of N.M. Hosp.*, 114 N.M. 228, 232, 836 P.2d 1249, 1253 (Ct.App.1992) (discussing the respective burdens of summary judgment for movant and nonmovant in the context of a medical malpractice action).

{29} We recognize that the fact that the notice was returned to the PTD marked unclaimed rebuts any presumption of actual receipt arising from the fact of mailing. *See Wells Fargo Bank v. Carter (In re Carter)*, 511 F.2d 1203, 1204 (9th Cir.1975). However, under *Mullane*, the relevant inquiry is not whether Cordova actually received the notice, but rather, whether the PTD employed a method of service reasonably calculated to result in Cordova's actual receipt of the notice. *See Dusenbery v. United States*, 534 U.S. 161, 170, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002) (discussing *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983)).

{30} In our view, just as *Mullane* assumes a hypothetical sender "desirous of actually informing the absentee," 339 U.S. at 315, 70 S.Ct. 652, *Mullane* assumes a hypothetical *recipient* desirous of actually being *informed*. In response to W & P's motion, Cordova never directly denied receiving from the post office one or more notices of attempted delivery of the PTD's notice. Indeed, in his brief in this Court, Cordova relies on the tepid assertion that "Plaintiff failed to accept delivery of the certified letter, which contained the ... Notice of Tax Sale." The fact that Cordova "failed to accept delivery" does not call into question the reasonableness of the PTD's attempt to serve Cordova with notice by certified mail sent to Cordova's correct address. *See Maso v. N.M. Taxation & Revenue Dep't*, 2004–NMSC–028, ¶ 13, 136 N.M. 161, 96 P.3d 286 (observing that "where circumstances are such that a reasonably prudent person should make inquiries, that person is charged with knowledge of the facts reasonable inquiry would have revealed") (internal quotation marks and citation omitted). Cordova failed to demonstrate a genuine issue of material fact as to the constitutional adequacy of the notice provided by the PTD.

## 2. Summary Judgment as to the Bernalillo County Treasurer's Office Constructive Fraud

{31} Cordova argues that there are genuine issues of material fact as to whether he was subjected to constructive fraud by the BCTO. Cordova points to the June 1997 letter from the BCTO informing Cordova that his account would be transferred to the PTD for collection and that "[t]he State will then offer this property at public sale in *1998*." (Emphasis added). Cordova claims that he was lulled into inaction by the reference to a sale "in 1998," which he understood as a representation that the Property would not be sold prior to 1998. Cordova claims that he was further misled by statements made to him during the August 1997 meeting with Kavanaugh and representatives of the PTD. Cordova claims that he was specifically told that he could pay his delinquent taxes on October 1, 1997, and avoid having the Property "go[ ] to the state."

{32} Prior to 1973, constructive fraud by the officer selling property was a statutory ground for attacking a tax deed. *Worman v. Echo Ridge Homes Coop.*, 98 N.M. 237, 647 P.2d 870 (1982) (discussing NMSA 1953, § 72–8–20). In 1973, the Legislature amended the Property Tax Code, omitting fraud by tax officials from the list of statutory grounds for attacking a tax deed. 1973 N.M. Laws ch. 258, § 110(D). Constructive fraud by tax officials is no longer a ground for setting aside a tax deed. NMSA 1978, § 7–38–70(D) (1982).

{33} To the extent the complaint can be construed as seeking damages as an alternative to setting aside the tax deed, the BCTO, as a governmental entity, is immune from liability for damages absent a statutory waiver. NMSA 1978, § 41–4–4(A) (1996) (amended 2000). Constructive fraud is not one of the activities for which sovereign immunity has been waived. *Valdez v. State*, 2002–NMSC–028, ¶ 9, 132 N.M. 667, 54 P.3d 71; *Health Plus of New Mexico, Inc. v. Harrell*, 1998–NMCA–064, ¶ 17, 125 N.M. 189, 958 P.2d 1239.

{34} Cordova argues that the BCTO's constructive fraud contributed to his lack of actual notice that his property would be sold on September 30, 1997, thereby implicating "notice requirements embodied in the Feder-

al and State Constitutional due process requirements." To the extent Cordova is attempting to recast his constructive fraud claim as a state constitutional claim, it is barred by Section 41-4-4(A). *See Begay v. State,* 104 N.M. 483, 488, 723 P.2d 252, 257 (Ct.App.1985) (observing that Tort Claims Act extends to claims based on violations of the New Mexico Constitution), *rev'd on other grounds by Smialek v. Begay,* 104 N.M. 375, 721 P.2d 1306 (1986). However, we agree with Cordova that the Tort Claims Act does not immunize the BCTO from a federal constitutional claim for damages based upon his right to adequate notice. *See Carter v. City of Las Cruces,* 1996-NMCA-047, ¶ 6, 121 N.M. 580, 915 P.2d 336.

{35} It is undisputed that the June 1997 bill from the BCTO referred to a tax sale in 1998. Further, for purposes of summary judgment we must view the evidence most favorable to the non-movant, Cordova, and therefore for purposes of summary judgment we accept as true Cordova's testimony that he was told that he could pay his delinquent taxes on October 1, 1997, and still avoid having his property "go[ ] to the state." We conclude that Cordova established genuine issues of material fact as to whether these representations precluded Cordova from having actual notice of the deadline by which he was required to pay his taxes in order to prevent a tax sale.

{36} To the extent Cordova is attempting to recast his constructive fraud claim as a due process claim, we emphasize the principle that due process is satisfied by *either* actual notice *or* notice reasonably calculated, under all the circumstances, to apprise the affected party. We have already determined that Cordova subsequently received notice from the PTD reasonably calculated to apprise Cordova of the September 30, 1997, tax sale. The PTD's August 29, 1997, notice, which correctly advised Cordova that the property was to be sold at a public auction on September 30, 1997, at 10:00 a.m. unless delinquent taxes, penalties, and interest were paid to the BCTO prior to the sale, provided Cordova with the notice he was due. We consider it immaterial that this subsequent constitutionally adequate notice came from the PTD rather than the BCTO.

### 3. Summary Judgment as to the PTD

{37} The PTD was the last Defendant to move for summary judgment.[4] The PTD argued that under the doctrines of collateral estoppel and law of the case it was entitled to the benefit of the prior orders granting summary judgment to W & P and the BCTO. The PTD pointed out that the only allegations against the PTD related to the adequacy of the notice mailed out to Cordova by the PTD. The PTD argued that "all claims made against the [PTD] have been adjudicated in the [PTD's] favor in the summary judgments entered in favor of the other two [D]efendants in this case." In his response, Cordova argued that in granting the prior summary judgments in favor of W & P and the BCTO, the district court had overlooked genuine issues of material fact created by the evidence in front of the district court when it granted the prior summary judgments. Cordova attached to his response the evidentiary materials that had been before the district court when it ruled on W & P's motion. Cordova argued that the district court had the inherent authority to revisit its earlier rulings and that the district court should reverse its orders granting summary judgment to W & P and the BCTO and deny the PTD's motion for summary judgment. The

---

4. In its motion for summary judgment the PTD referred the district court to various "findings" that the district court had included in its orders granting summary judgments in favor of W & P and the BCTO. These orders were prepared by counsel for W & P and the BCTO. We once again emphasize that it is not necessary, nor is it even proper, for orders granting summary judgment to include findings of fact because such findings are inconsistent with the very premise of a motion for summary judgment. *Durham v. Southwest Developers Joint Venture,* 2000-NMCA-010, ¶ 45, 128 N.M. 648, 996 P.2d 911. We do not mean, however, to discourage district courts from designating each material fact as to which the court has determined there is no genuine issue.

district court rejected Cordova's arguments and granted the PTD's motion for summary judgment.

 {38} We conclude that the district court's order granting summary judgment in favor of the PTD should be upheld as resting on a proper application of collateral estoppel. "[A] summary judgment is a decision on the merits of the case. Thus, a Rule 56 motion will be granted on the basis of former adjudication when an earlier summary judgment has disposed of the same issues between sufficiently related parties." 10B Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice & Procedure* § 2735, at 303–04 (3d ed.1998) (footnotes omitted). New Mexico case law has endorsed non-mutual, offensive collateral estoppel. *Silva v. State*, 106 N.M. 472, 476, 745 P.2d 380, 384 (1987). Non-mutual, offensive collateral estoppel applies where a defendant seeks to preclude the plaintiff from relitigating an issue the plaintiff has previously litigated and lost. *Id.* Although the district court did not explain the basis of its ruling, we may affirm its grant of summary judgment on any ground that is supported by the record if affirmance on that ground would not be unfair to the appellant. *Moffat v. Branch*, 2002–NMCA–067, ¶ 13, 132 N.M. 412, 49 P.3d 673. There is no unfairness in relying on this ground since it was raised by the PTD's motion for summary judgment. Furthermore, the record conclusively establishes that Cordova had a full and fair opportunity to litigate the issue of adequate notice in response to W & P's motion for summary judgment.

## CONCLUSION

{39} The summary judgments granted in favor of W & P, the BCTO, and the PTD are affirmed.

{40} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN and RODERICK T. KENNEDY, Judges.