2007-NMCA-060

160 P.3d 587

The NEW MEXICO PETROLEUM MARKETERS ASSOCIATION, Indian Capitol Distributing Co., Inc., Hookinson, Inc., and Ever–Ready Oil Co., Inc., Petitioners–Appellants,

v.

NEW MEXICO ENVIRONMENTAL IMPROVEMENT BOARD, Respondent–Appellee,

In the Matter of Petition for a Public Hearing to Consider Proposed New Regulations in Title II, Chapter 5, Part 6 of the New Mexico Administrative Code (Convenience Store Regulations).

The New Mexico Petroleum Marketers Association, Indian Capitol Distributing Co., Inc., Hookinson, Inc., and Ever–Ready Oil Co., Inc., Petitioners–Appellants,

v.

New Mexico Environmental Improvement Board, Respondent–Appellee,

In the Matter of Petition for a Public Hearing to Consider Proposed New Regulations in Title II, Chapter 5, Part 6 of the New Mexico Administrative Code (Convenience Store Regulations).

Nos. 24,841, 25,420.

Court of Appeals of New Mexico.

April 2, 2007.

Rodey, Dickason, Sloan, Akin & Robb, P.A., Richard C. Minzner, Jocelyn Drennan, Edward Ricco, Albuquerque, NM, for Appellants.

Gary K. King, Attorney General, Mary H. Smith, Assistant Attorney General, Santa Fe, NM, for Appellee.

NM Environment Department, Tracy Hughs, General Counsel, Leslie G. Barnhart, Assistant General Counsel, Charles F. Noble, Assistant General Counsel, Santa Fe, NM,

for Intervenor–Appellee, New Mexico Environment Department.

McGinn, Carpenter, Montoya & Love, P.A., Randi McGinn, Allegra Carpenter, Albuquerque, NM, for Amicus Curiae.

## OPINION

ALARID, Judge.

{1} This case requires us to consider the validity of regulations adopted by the New Mexico Environmental Improvement Board (EIB) addressing violence against convenience store workers. We hold that the EIB had authority pursuant to the New Mexico Occupational Health and Safety Act (NMOH-SA) to adopt regulations to protect convenience store workers from violence in the workplace; that the Legislature's delegation of the authority to promulgate these regulations to the EIB does not violate the constitutional doctrine of separation of powers; and that the regulatory definitions of "convenience store" and "convenience goods" are not unconstitutionally vague. We affirm.

## BACKGROUND

{2} In 2003, the Legislature passed Joint Memorial 4, directing the EIB's Occupational Health and Safety Bureau to study the problem of assaults, robberies, and other violent acts against employees at late-night retail establishments. The EIB reviewed federal studies and recommendations and efforts taken in other state and local jurisdictions to reduce or prevent violence in late-night retail establishments. The EIB conducted its own studies and held town hall meetings in Santa Fe, Las Cruces, Roswell, Farmington, Hobbs, Albuquerque, and Taos. The EIB also met with representatives of the convenience store industry. Based on an examination of police reports and records maintained by the New Mexico Department of Labor, the EIB found that between January 1998 and April 2003, convenience stores in New Mexico were the site of "16 reported homicides, 24 rapes, 37 kidnappings, 392 batteries, 1,451 assaults, 467 aggravated assaults, 7 drive-by shootings, [and] 2,633 robberies." The EIB proposed regulations "[t]o establish

standards related to the occupational health and safety of employees in the convenience store industry." The EIB held a public hearing on the proposed regulations in March 2004. The EIB orally amended the regulations and voted in favor of adopting the regulations. On April 19, 2004, the EIB filed a Statement of Reasons adopting the regulations as amended, with an effective date of June 1, 2004.

{3} Appellants, New Mexico Petroleum Marketers Association, Indian Capitol Distributing Co., Inc., Hookinson, Inc., and Every–Ready Oil Co., Inc.,[1] filed a notice of appeal. Appellants asserted that the manner in which the regulations were adopted was procedurally defective; that the regulations were unconstitutionally vague; and, that the EIB lacked statutory authority to enact the regulations.

{4} While this first appeal was pending, the EIB conducted further hearings. On October 5, 2004, the EIB voted to adopt the amended regulations. On October 19, 2004, the EIB filed a Statement of Reasons adopting the amended regulations. Appellants filed a second notice of appeal. We consolidated the two appeals.

## DISCUSSION

{5} This appeal is authorized by NMSA 1978, § 50–9–15 (1999). We are authorized to set aside a regulation of the EIB only if it is found to be:

(1) arbitrary, capricious or an abuse of discretion;

(2) not supported by substantial evidence in the record; or

(3) otherwise not in accordance with law.

Section 50–9–15(B)(1)–(3). Appellants do not argue that the regulations are not supported by substantial evidence. Appellants have dropped their procedural challenge to the regulations. In these consolidated appeals, Appellants make three substantive arguments: (1) the regulations are not authorized by the NMOHSA; (2) the regulations violate the doctrine of separation of powers; and (3) the regulations are unconstitutionally vague.

---

**1.** Appellants describe themselves as "operators of businesses that are or might be classified as convenience stores under the regulations, and their trade organization."

## 1. Whether the Coverage of the NMOH-SA Includes the Hazard of Third–Party Violence Against Employees

{6} Our Legislature enacted the NMOH-SA in 1972. 1972 N.M. Laws ch. 63. The declared purpose of the Legislature in enacting the NMOHSA was "to assure *every* working man and woman safe and healthful working conditions." *Id.* § 2 (emphasis added). The NMOHSA contains a very broad definition of employee: "'employee' means an individual who is employed by an employer, but does not include a domestic employee or a volunteer nonsalaried firefighter[.]'" NMSA 1978, § 50–9–3(B) (1993). The NMOHSA defines "'place of employment'" as "any place, area or environment in or about which an employee is required or permitted to work[.]" Section 50–9–3(F).

{7} The Legislature provided that the goal of protecting working men and women would be achieved in part through "the establishment of occupational health and safety regulations applicable to places of employment in this state[.]" NMSA 1978, § 50–9–2(A) (1993). The Legislature directed the EIB to promulgate regulations "that are and will continue to be *at least* as effective as standards promulgated pursuant to the federal Occupational Safety and Health Act of 1970 to prevent or abate detriment to the health and safety of employees." NMSA 1978, § 50–9–7(A) (1993) (emphasis added).

{8} Appellants argue that Congress, in enacting the federal Occupational Safety and Health Act (OSHA)[2] on which the NMOHSA is patterned,[3] did not intend to address injuries inflicted on workers by the criminal acts of third parties. We disagree. Congress expressly stated that the purpose of OSHA was "to assure so far as possible *every* working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b) (2000) (emphasis added). Congress

imposed a general duty on each employer to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1) (2000). The language employed by Congress is easily broad enough to encompass workplace violence. Nothing in the text of OSHA compels us to hold that as a matter of law third-party violence against employees cannot constitute a "recognized hazard[ ] . . . causing or . . . likely to cause death or serious physical harm." *Id.* We note that Appellants have not cited any reported judicial decision or administrative ruling concluding that third-party violence against employees is excluded as a matter of law from the coverage of OSHA.

{9} We acknowledge that in 1970, when Congress enacted OSHA, the extent of the hazard of third-party violence against employees may not have been fully recognized. We are not persuaded that Congress intended to limit coverage solely to those safety and health hazards that were identified and understood in 1970.[4] Congress contemplated that the purposes of the federal OSHA would be achieved in part by "stimulat[ing] employers and employees *to institute new . . . programs providing for safe and healthful working conditions.*" 29 U.S.C. § 651(b)(1) (emphasis added). "Congress specifically included recordkeeping provisions . . . to aid in enforcing [OSHA] and in preventing future accidents and illnesses." Mark A. Rothstein, Occupational Safety and Health Law 234 (4th ed.1998). Congress authorized "research, experiments, and demonstrations relating to occupational safety and health, including studies of psychological factors involved, and relating to innovative methods, techniques, and approaches for dealing with occupational safety and health problems." 29 U.S.C. § 669(a)(1) (2000).

---

2. Occupational Safety and Health Act, Pub. Law 91–596 (codified at 29 U.S.C. § 651 (2000)).

3. *See Gutierrez v. Sundancer Indian Jewelry, Inc.,* 117 N.M. 41, 868 P.2d 1266 (Ct.App.1993) (observing that state OSHA codes are "patterned after" federal OSHA).

4. Where there were preexisting "national consensus" or "established Federal" safety or health

standards, Congress directed the Secretary of Labor "as soon as practicable" to promulgate these standards as occupational safety or health standards "unless he determines that the promulgation of such a standard would not result in improved safety or health." 29 U.S.C. § 655(a) (1970).

Responsibility for collecting statistics on occupational injuries and illnesses was delegated to the Bureau of Labor Statistics. United States Department of Labor Bureau of Labor Statistics, History of BLS Safety and Health Statistical Programs (October 16, 2001) (discussing the BLS's role under OSHA), *available at* http://www.bls.gov/iif/oshhist.htm. Congress created the National Institute for Occupational Safety and Health and directed it to conduct studies and research to develop criteria for new or improved safety and health standards. 29 U.S.C. § 671(d)(1) (2000). Workplace violence against employees seems to us to be precisely the type of emerging workplace hazard that the record-keeping and research provisions of OSHA were designed to discover and monitor.

{10} Appellants assert that OSHA "has neither been interpreted nor applied to confer authority on the responsible federal agency to adopt regulatory measures aimed at preventing crime." Again we disagree. It is true that the Occupational Safety and Health Administration (the Administration) has not promulgated binding standards addressing workplace violence. However, the Administration has addressed workplace violence by issuing non-binding "Recommendations for Workplace Violence Prevention Programs in Late–Night Retail Establishments." *Available at* http://www.osha.gov/Publications/osha 3153.htm. Furthermore, the Administration has taken the position that violence in the workplace is a proper subject for regulation under the general duty clause of OSHA. Letter of December 10, 1992, from Roger A. Clark, Director, OSH Administration Directorate of Enforcement Programs, to Mr. John R. Schuller (concluding that "[i]n a workplace where the risk of violence and serious personal injury are significant enough to be 'recognized hazards,' the general duty clause would require the employer to take feasible steps to minimize those risks") available at http://www.osha.gov/pls/osha web/owadisp.show_document?p_table=IN-TERPRETATIO NS & p_id=20951.

{11} We hold that the plain language of OSHA and the NMOHSA supports the EIB's interpretation extending the coverage of these statutes to workplace violence. With limited exceptions not at issue in this case, these statutes apply broadly to every worker. To accept Appellants' interpretation of the federal OSHA and the NMOHSA we would have to read into these statutes limitations on coverage that were not enacted by Congress or our Legislature. We apply statutes according to their plain meaning, unless adherence to the literal meaning would lead to injustice, absurdity, or internal contradiction. *T–N–T Taxi, LTD. v. N.M. Pub. Regulation Comm'n*, 2006–NMSC–016, ¶ 5, 139 N.M. 550, 135 P.3d 814. Appellants have not convinced us that adherence to the literal meaning of the broad language employed by Congress and the Legislature would lead to injustice, absurdity, or internal contradiction. Moreover, applying OSHA and the NMOHSA to the emerging problem of workplace violence furthers the remedial purposes of OSHA and the NMOHSA. *Universal Constr. Co. v. OSH Review Comm'n*, 182 F.3d 726, 729 (10th Cir.1999) (observing that OSHA is "remedial legislation designed to protect employees from workplace dangers, and therefore must be liberally construed").

## 2. Whether the NMOHSA Violates the Doctrine of Separation of Powers

{12} The doctrine of separation of powers is expressly incorporated by our state Constitution:

The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others, except as in this constitution otherwise expressly directed or permitted.

N.M. Const. art. III, § 1. Although the language of Article III, Section 1 suggests an absolute separation of the three branches, our Supreme Court has stated that "absolute separation of powers is 'neither desirable nor realistic,' and that the constitutional doctrine of separation of powers permits some overlap of governmental functions." *State ex rel.*

*Taylor v. Johnson*, 1998–NMSC–015, ¶ 23, 125 N.M. 343, 961 P.2d 768 (citation omitted).

{13} Quoting *Madrid v. St. Joseph Hospital*, 1996–NMSC–064, ¶ 13, 122 N.M. 524, 928 P.2d 250, Appellants argue that "[t]he line of permissible legislative delegation is crossed when the delegation gives an administrative agency 'the power to determine what the law will be.'" This statement by our Supreme Court should not be taken entirely literally or read in isolation. Our Supreme Court also has recognized that the Legislature may delegate to an agency the power to "develop the necessary policy to respond to unaddressed or unforeseen issues," *City of Albuquerque v. NMPRC*, 2003–NMSC–028, ¶ 16, 134 N.M. 472, 79 P.3d 297; and, that "[w]here an agency has the authority to act, its rules and regulations have the binding effect of statutes," *id.* ¶ 17 (quoting *In re A Declaratory Ruling by the N.C. Comm'r of Ins.*, 134 N.C.App. 22, 517 S.E.2d 134, 140 (1999)) (internal quotation marks omitted). "[I]t has become wholly illogical thus to grant the fact of administrative power and still to deny the name. In Justice White's words, 'There is no question but that agency rulemaking is lawmaking in any functional or realistic sense of the term.'" Bernard Schwartz, *Administrative Law* § 2.1 at 42 (3d ed.1991) (quoting *I.N.S. v. Chadha*, 462 U.S. 919, 986, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (White, J., dissenting)). "If legislative power means the power to make rules of conduct that bind everyone based on resolution of major policy issues, scores of agencies exercise legislative power routinely." 1 Richard J. Pierce, Jr., *Administrative Law Treatise* § 2.3 at 39 (4th ed.2002).

▮ {14} The doctrine of separation of powers is satisfied if the Legislature provides a statutory standard, or "intelligible principle" to guide an administrative agency in exercising delegated authority. *Rivas v. Bd. of Cosmetologists*, 101 N.M. 592, 593, 686 P.2d 934, 935 (1984). We are satisfied that the NMOHSA sets out the requisite intelligible principle in Section 50–9–7(A). Although the Legislature broadly instructs the EIB to promulgate regulations "that are and will continue to be at least as effective as standards promulgated pursuant to the federal [OSHA] to prevent or abate detriment to the health and safety of employees," the Legislature expressly requires the EIB to consider:

(1) character and degree of injury to or interference with the health and safety of employees proposed to be abated or prevented by the regulation;

(2) technical practicability and economic reasonableness of the regulation and the existence of alternatives to the prevention or abatement of detriment to the health and safety of employees proposed by the regulation; and

(3) the public interest, including the social and economic effects of work-related accidents, injuries and illnesses.

Section 50–9–7(A).

Once it is conceded, as it must be, that no [law] can be entirely precise, and that some judgments, even some judgments involving policy considerations, must be left to the officers executing the law ..., the debate over unconstitutional delegation becomes a debate not over a point of principle but over a question of degree. As Chief Justice Taft expressed the point ... the limits of delegation "must be fixed according to ... the ... necessities of the governmental co-ordination."

*Mistretta v. United States*, 488 U.S. 361, 415–16, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (Scalia, J., dissenting) (citation omitted). The determination of the appropriate degree of generality of the standards to be used by an agency in balancing competing policy interests is itself an important policy judgment, committed in the first instance to the Legislature. It is not clear to us that courts are demonstrably better qualified than the Legislature to make such judgments. *See id.* (questioning whether the Supreme Court is better equipped than Congress to decide whether the necessities of government justify a particular delegation of policy judgment). "During the twentieth century, administrative agencies possessing the legislative power to promulgate rules and regulations having the force of law have become commonplace. The law on delegation has moved from the theoretical prohibition against any delegation of legislative power ... to a rule against unrestricted delegations." Schwartz, *supra*,

at 44. Here, the Legislature has specified the end to be accomplished by the NMOH-SA—safe and healthful working conditions; has directed that this end be accomplished in part through the promulgation of regulations; and has provided specific criteria to be considered by the EIB in adopting regulations. This is sufficient to satisfy the doctrine of separation of powers.

### 3. Whether the Regulations Defining "Convenience Store" and "Convenience Goods" are Unconstitutionally Vague

**{15}** Appellants argue that the following two definitions are unconstitutionally vague:

D. "Convenience store" means any business that is primarily engaged in the retail sale of convenience goods, or both convenience goods and gasoline, and employs one or more employees during the normal operating hours of the establishment. This term excludes businesses that operate as hotels, taverns, lodging facilities, restaurants, stores that sell prescription drugs, gasoline service stations, grocery stores, supermarkets, businesses that have more than 10,000 square feet of retail floor space, farmer's markets, roadside stands, on-site farm markets, and other agricultural activities or operations.

E. "Convenience goods" means articles that are purchased frequently for immediate use in readily accessible stores and with a minimum of effort. This term includes consumable items that are generally limited in quantity and variety, and sold in their original containers. This definition is not intended to exclude convenience stores that sell a small quantity of fresh food or unpackaged products in addition to other convenience goods.

11.5.6.7(D)(E) NMAC (2004).

The definition of "convenience goods" is the focus of Appellants' challenge. Appellants challenge the definition of "convenience store" largely because it incorporates the term "convenience goods."

**{16}** A court entertaining a pre-enforcement challenge to a regulation that does not implicate constitutionally protected con-duct such as the First Amendment right to freedom of expression may sustain a vagueness challenge only if the law "is impermissibly vague in all of its applications." *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

**{17}** As an initial matter, we address the EIB's argument that Appellants lack standing to bring a vagueness challenge. The Legislature has provided that "[a]ny person who is or may be affected by a regulation ... may appeal to the court of appeals for further relief." Section 50–9–15(A). As we understand this provision, an appellant must demonstrate that he or she, *personally,* "is or may be affected by a regulation." Thus, Section 50–9–15(A) does not authorize an appellant to appeal on the ground that some other person or class of persons "is or may be affected by a regulation" in a way that does not also affect the appellant. We hold that Appellants do not have standing to advance arguments based on the hypothetical effect of the regulations on the owners and operators of take-out food franchises, small specialty stores, hot dog vendors, ice cream trucks, greeting card stores, and miscellaneous shops located in hotels, office buildings, and airports due to the absence of any showing that Appellants or Appellants' members are engaged in these businesses.

**{18}** "The vagueness doctrine is based on notice." *State ex rel. Health & Soc. Servs. Dep't v. Natural Father,* 93 N.M. 222, 225, 598 P.2d 1182, 1185 (Ct.App.1979). An agency drafting regulations is not required to write for the benefit of deliberately unsympathetic or wilfully obtuse readers: for purposes of due process, a governmental agency attempting to give notice to members of the public may assume "a hypothetical recipient desirous of actually being informed." *See Cordova v. Taxation & Revenue, Prop. Tax Div.,* 2005–NMCA–009, ¶ 30, 136 N.M. 713, 104 P.3d 1104 (emphasis omitted) (discussing due process requirements as to method of giving notice). The EIB was entitled to assume that it was dealing with persons of ordinary intelligence, who are acquainted with the ordinary usages within their indus-

try. *Village of Hoffman Estates,* 455 U.S. at 501 n. 18, 102 S.Ct. 1186 (applying a 'business person of ordinary intelligence' standard in judging the vagueness of a village ordinance regulating the sale of drug paraphernalia; observing that the term 'roach clip' has a sufficiently clear meaning within that industry). Moreover, because "few words possess the precision of mathematical symbols, [and] most [laws] must deal with untold and unforeseen variations in factual situations," due process demands "no more than a reasonable degree of certainty." *Boyce Motor Lines v. United States,* 342 U.S. 337, 340, 72 S.Ct. 329, 96 L.Ed. 367 (1952); *see also N.M. Mun. League, Inc. v. N.M. Envtl. Improvement Bd.,* 88 N.M. 201, 207–09, 539 P.2d 221, 227–29 (Ct.App.1975) (rejecting claims that "significant," "adequate," "fly proof," "rodent proof," "offensive odors," and "unsightliness" were unconstitutionally vague in the context of solid waste regulations).

{19} We think that the phrase "are purchased frequently for immediate use" broadly distinguishes between goods that because of the quantity or the condition in which they are sold commonly are purchased for consumption or initial use within a relatively limited period of time after purchase and goods that commonly are purchased for later consumption or consumption over a period of time. For example, staples sold in large quantities for consumption over a period of time, such as ten pound bags of sugar, full cases of canned pet food, twelve-roll packages of toilet paper, or 250–count bottles of aspirin are not convenience goods, even though these same items may be convenience goods when packaged and sold in smaller quantities (typically at a higher price per unit). Foods such as chilled soda or beer, hot coffee, or sandwiches and breakfast burritos sold at serving temperature are examples of goods that because of the condition in which they are sold commonly are purchased for consumption within a relatively limited period of time after purchase. We think that the phrase "in readily accessible stores" conveys a relatively close physical proximity of the store entrance to off-street parking, sidewalks, and roadways, while the phrase "minimum of effort" helps to convey the ease of shopping in a store that displays a limited selection of goods within a relatively compact floor plan. Read together, the two phrases "in readily accessible stores" and "with a minimum of effort" encapsulate the "quick in, quick out" experience of shopping in a convenience store.

{20} The regulatory definitions of convenience store and convenience goods should not be read in isolation. New Mexicans have had many years of experience with convenience stores. "The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding." *Silver City Consol. Sch. Dist. No. 1 v. Bd. of Regents of N.M. W. Coll.,* 75 N.M. 106, 111, 401 P.2d 95, 99 (1965). The EIB's definitions must be understood to supplement, rather than replace, the common understanding of convenience store.

{21} We are satisfied that there are substantial numbers of businesses that are described with reasonable certainty by the definitions of "convenience store" and "convenience goods" as we have construed them. Appellants have failed to demonstrate that these definitions are impermissibly vague in all of their applications. *Village of Hoffman Estates,* 455 U.S. at 495, 102 S.Ct. 1186. Accordingly, Appellants' facial vagueness challenge fails.

## CONCLUSION

{22} We affirm the action of the EIB in adopting regulations to protect convenience store workers, as codified at Title 11, Chapter 5, Part 6, NMAC.

{23} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN, Chief Judge, and MICHAEL E. VIGIL, Judge.