The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: March 18, 2024

**NO. S-1-SC-38815**

**SOUTHWESTERN PUBLIC SERVICE COMPANY,**

Appellant,

v.

**NEW MEXICO PUBLIC REGULATION COMMISSION,**

Appellee,

and

**NEW MEXICO LARGE CUSTOMER GROUP, PUBLIC SERVICE COMPANY OF NEW MEXICO, EL PASO ELECTRIC COMPANY, OCCIDENTAL PERMIAN LTD., WESTERN RESOURCE ADVOCATES, and LOUISIANA ENERGY SERVICES, L.L.C.,**

Intervenors-Appellees.

**In the Matter of Potential Amendments to NMPRC Rule 17.9.572 NMAC, Entitled Renewable Energy for Electric Utilities, Case No. 19-00296-UT**

**CONSOLIDATED WITH NO. S-1-SC-39149**

**SOUTHWESTERN PUBLIC SERVICE COMPANY,**

Appellant,

v.

**NEW MEXICO PUBLIC REGULATION COMMISSION,**

Appellee.

**In the Matter of Southwestern Public Service Company's Annual 2022 Renewable Energy Portfolio Procurement Plan and Requested Approvals Therein; Proposed 2022 Renewable Portfolio Standard Cost and Reconciliation Riders; Application for an RPS Incentive; and Other Associated Relief Case No. 21-00172-UT**

**APPEAL FROM THE NEW MEXICO PUBLIC REGULATION COMMISSION**

Hinkle Shanor, LLP
Dana S. Hardy
Jaclyn M. McLean
Jeremy I. Martin
Timothy B. Rode
Santa Fe, NM

XCEL Energy Services, Inc.
Zoe E. Lees
Santa Fe, NM
Francis W. Dubois
Austin, TX

for Appellant


Judith E. Amer, Associate General Counsel
Santa Fe, NM

for Appellee


PNM Resources, Inc.
Leslie M. Padilla
Stacey J. Goodwin
Albuquerque, NM

Miller Stratvert, P.A.
Richard L. Alvidrez
Samantha E. Kelly
Albuquerque, NM

for Intervenor Public Service Company of New Mexico


El Paso Electric Company
Nancy B. Burns
Santa Fe, NM

Montgomery & Andrews, P.A.
Jeffrey J. Wechsler
Kari E. Olson
Jocelyn Barrett-Kapin
Santa Fe, NM

for Intervenor El Paso Electric Company

O'Melveny & Myers, LLP
Katherine L. Coleman
Phillip G. Oldham
Austin, TX

for Intervenor Occidental Permian, Ltd.


Holland & Hart LLP
Larry J. Montaño
Santa Fe, NM
Nikolas Stoffel
Austin Jensen
Denver, CO

for Intervenor The New Mexico Large Group


Western Resource Advocates
Cydney Beadles
Steven S. Michel
Santa Fe, NM

Keleher & McLeod, P.A.
Thomas C. Bird
Albuquerque, NM

for Intervenor Western Resource Advocates


Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Joan E. Drake
Albuquerque, NM

for Intervenor Louisiana Energy Services, LLC

**OPINION**

**THOMSON, Justice.**

{1}     In this consolidated appeal, we first consider whether the New Mexico Public Regulation Commission (the PRC) misconstrued the financial incentive provision of the Renewable Energy Act to deny Southwestern Public Service Company's (SPS's) 2021 application for an incentive. *See* NMSA 1978, § 62-16-4(D) (2019) (providing for the award of "financial or other incentives"); Renewable Energy Act, NMSA 1978, §§ 62-16-1 to -10 (2004, as amended through 2021) (the REA or the Act)[1]. We then consider SPS's numerous facial challenges to the PRC's April 2021 order. That order adopted 2021 amendments to Rule 572 (the Amended Rule)—regulations implementing the PRC's duties under the REA's 2019 amendments, including the

---

[1]The REA's 2019 amendment is relevant to this opinion. The current (2021) REA consists of two statutes from 2007, seven from 2019, and one— Section 62-16-5—enacted in 2019 and amended in 2021 by the addition of Subsection (B)(1)(d) (*on which this opinion does not rely*). Accordingly in this opinion, all nondated references to the REA or to the Act and all citations of statutes therein are supported fully by the current enactments.

duty to award an incentive when appropriate.[2] *See* Renewable Energy for Electric Utilities, 17.9.572 NMAC (5/4/2021, as amended through 2/28/2023); 17.9.572.22 NMAC (5/4/2021) (setting forth requirements to apply for an incentive).

{2}     We hold that SPS's proposed retirement of banked, renewable energy certificates (RECs) to exceed the Renewable Portfolio Standard (RPS) was insufficient to qualify for an incentive under the REA because the proposed retirement would not have "produce[d] or acquire[d] renewable energy" as required by Section 62-16-4(D).[3] *See* § 62-16-3(G) ("'[REC]' means a certificate or other record . . . that represents all the environmental attributes from one megawatt-hour of electricity generated from renewable energy."); § 62-16-3(I) ("'[RPS]' means the minimum percentage of retail sales of electricity by a public utility . . . that is required by the [REA] to be from renewable energy . . . ."). Our conclusion is based

_____

[2]SPS has filed two additional appeals that separately challenge the PRC's subsequent orders denying SPS's application for a financial incentive for 2023 and approving further amendments to Rule 572 in February 2023 (the Second Amended Rule). *See* S-1-SC-39733; S-1-SC-39796; *see also* 17.9.572 NMAC (2/28/2023). We have consolidated and held in abeyance those appeals pending the outcome of this proceeding.

[3]We use the phrase "banked REC" throughout this opinion to refer to an REC that represents renewable energy generated in a year *before* the year in which the REC is retired. *See* § 62-16-5(B)(4) (providing that an REC "may be carried forward for up to four years from the date of issuance to establish compliance with the [RPS], after which [the REC] shall be deemed retired").

on the statute's plain language, which is consistent with the REA's clear legislative intent to require public utilities to procure sufficient renewable energy resources to reduce carbon emissions and achieve the zero carbon resource standard by 2045. *See* § 62-16-4(A) (providing public utilities with a sequence of increasingly renewable, energy benchmarks to achieve by 2045); § 62-16-3(K) ("'[Z]ero carbon resource' means an electricity generation resource that emits no carbon dioxide into the atmosphere . . . as a result of electricity production.").

{3}     We also hold that the challenged provisions of the Amended Rule (1) do not exceed the scope of the REA; (2) are not arbitrary, capricious, or void for vagueness; and (3) are not otherwise unreasonable or unlawful. We therefore affirm the PRC in all respects. *See* NMSA 1978, § 62-11-5 (1982) ("The supreme court shall vacate and annul the order complained of if it is made to appear to the satisfaction of the court that the order is unreasonable or unlawful.").

## I.     BACKGROUND

{4}     SPS's primary objection is to the PRC's approach to awarding incentives under the REA and the Amended Rule and the resulting denial of SPS's incentive application. We therefore begin with an overview of the REA and its incentive provision and the PRC's 2021 amendments to Rule 572, before summarizing SPS's

incentive request and the PRC's reasons for denial. We then address SPS's arguments in turn.

**A.    Overview of the REA and the 2021 Amendments to Rule 572**

{5}    Section 62-16-4 is the heart of the REA. Among other things, the provision establishes the RPS and the related requirements for public utilities to meet that standard. *See id.*; *see also* § 62-16-3(I). Before 2019, Section 62-16-4 set forth a series of increasing RPS benchmarks culminating in a requirement for public utilities to supply at least twenty percent of retail electricity sales from renewable energy by 2020. *See* § 62-16-4(A)(1)(a)-(d) (2014); *see also* § 62-16-3(F) ("'[R]enewable energy' means electric energy generated by use of renewable energy resources and delivered to a public utility."). In 2019, the Legislature extended the sequence of RPS benchmarks intended to achieve the ambitious zero carbon resource standard by 2045. *See* § 62-16-4(A)(1)-(6); *see also* § 62-16-3(L) ("'[Z]ero carbon resource standard' means providing New Mexico public utility customers with electricity generated from one hundred percent zero carbon resources."). At present, renewable energy must make up at least twenty percent of a utility's retail sales, which will increase to a minimum of forty percent by 2025, fifty percent by 2030, and eighty percent by 2040. *See* § 62-16-4(A)(2)-(5). In addition to these intermediate benchmarks, the Legislature mandated that "[r]easonable and consistent progress

4

shall be made over time toward [the] requirement" of supplying one hundred percent of retail electricity sales in New Mexico from zero carbon resources by 2045. Section 62-16-4(A)(6).

{6} Section 62-16-4 also prescribes the manner in which a public utility must comply with the RPS. To comply, a utility must retire enough RECs annually to "meet the [RPS] requirements" relative to the utility's total retail sales of electricity. *See* § 62-16-4(A); *see also* § 62-16-5(A)(1) (providing that the PRC shall establish "a system of [RECs] that can be used by a public utility to establish compliance with the [RPS]"). One REC represents one megawatt-hour of electricity generated from renewable energy and "may be carried forward for up to four years from the date of issuance to establish compliance with the [RPS], after which [the REC] shall be deemed retired." Section 62-16-5(B)(4); *see* § 62-16-3(G). Thus, any excess RECs that are not retired in the same year they are earned may be banked for up to four years and used to meet a utility's annual RPS obligation during that period. In addition, excess RECs "may be traded, sold or otherwise transferred by their owner, unless the certificates are from a rate-based public utility plant, in which case the entirety of the [RECs] from that plant shall be retired by the utility on behalf of itself or its customers." Section 62-16-5(B)(2).

{7} Of particular importance to this appeal, Section 62-16-4 also provides for the award of "financial or other incentives" for exceeding the Act's minimum requirements. *See* § 62-16-4(D). Before 2019, the REA tasked the PRC with "provid[ing] appropriate performance-based financial or other incentives to encourage public utilities to acquire renewable energy supplies that exceed the applicable annual [RPS]." Section 62-16-4(A)(4) (2007); *see also* § 62-16-2(A)(5) (2007) ("The legislature finds that . . . a public utility should have incentives to go beyond the minimum requirements of the [RPS] . . . ."). The 2019 amendments to Section 62-16-4 elaborated on the bases for which an incentive may be awarded:

> [T]he commission shall . . . develop and provide financial or other incentives to encourage public utilities to produce or acquire renewable energy that exceeds the applicable annual [RPS] set forth in this section; results in reductions in carbon dioxide emissions earlier than required by Subsection A of this section; or causes a reduction in the generation of electricity by coal-fired generating facilities, including coal-fired generating facilities located outside of New Mexico.

Section 62-16-4(D). Where the pre-2019 Act allowed incentives "to encourage public utilities to acquire renewable energy supplies that exceed the applicable annual [RPS]," § 62-16-4(A)(4) (2007), the Act now allows incentives "to encourage public utilities to produce or acquire renewable energy" that exceeds the RPS, results in early reductions in carbon dioxide emissions, or reduces coal-fired generation, § 62-16-4(D).

6

{8}     In response to the 2019 amendments to the REA, the PRC developed and approved significant amendments to Rule 572, including by adding provisions that govern the availability of incentives. *See* 17.9.572.22 NMAC (5/4/2021).[4] Among other things, the Amended Rule restates the general requirements set forth in Section 62-16-4(D) and articulates other, more specific requirements that a proposed course of action must satisfy to qualify for an incentive. For example, an incentive is available, by definition, "to encourage certain behaviors or actions *that would not otherwise have occurred* in order to further the outcomes described in Section 62-16-4 . . . ." *See* 17.9.572.7(F) NMAC (5/4/2021) (emphasis added).[5] Similarly, an incentive "must be related to measures implemented by the utility *after the effective date of this rule*." 17.9.572.22(B) NMAC (5/4/2021) (emphasis added).[6] And an incentive will *not* be awarded "with respect to a particular investment if the cost of

---

[4]Previous versions of Rule 572 did not address the incentive provisions of the Act. *See generally* 17.9.572 NMAC (5/31/2013); 17.9.572 NMAC (8/30/2007).

[5]The 2023 amendments to Rule 572 do not affect this provision. *See* 17.9.572.7(F) NMAC (2/28/2023).

[6]The Second Amended Rule amended this language as follows: "A financial or other incentive proposed under [this section] shall be to encourage the public utility to produce or to acquire renewable energy to accomplish, *in the future*, at least one of the following purposes: . . . ." 17.9.572.22(B) NMAC (2/28/2023) (emphasis added); *see also* 17.9.572.7(F) NMAC (5/4/2021) ("The financial incentive . . . motivates certain behaviors or actions.").

7

that investment exceeds the demonstrable value of the corresponding reduction in carbon dioxide or other emissions." 17.9.572.22(D) NMAC (5/4/2021).[7] The Amended Rule also provides that an "interested person" may apply for an exemption or variance from any of the rule's requirements when *inter alia* a "proposed alternative is in the public interest." 17.9.572.21(G) NMAC (5/24/2021).[8] As these provisions exemplify, the Amended Rule clarifies the circumstances in which an incentive may be awarded under the REA. Whether that clarity is consistent with the REA itself is one of the principal questions in this appeal.

**B.     Procedural Background**

{9}     The PRC approved the Amended Rule in an April 2021 order, after an eighteen-month rulemaking aimed at implementing the 2019 amendments to the REA. SPS participated throughout the rulemaking process along with Public Service Company of New Mexico (PNM), El Paso Electric Company (EPE), PRC Utility Division Staff, and various nonutility entities and individuals. SPS timely appealed from the order adopting the Amended Rule, alleging numerous legal infirmities and asking the Court to vacate and annul the order.

---

[7]The Second Amended Rule renumbered this provision and made minor changes that do not affect its substance. *See* 17.9.572.22(E) NMAC (2/28/2023).

[8]The Second Amended Rule made minor changes to this provision that do not affect its substance. *See* 17.9.572.21(A), (B)(7) NMAC (2/28/2023).

{10}   Weeks later, SPS filed an application with the PRC under the REA and the Amended Rule, seeking approvals of its 2022 Annual Renewable Energy Act Plan and of several proposed rate riders for the same year. These matters were uncontested and eventually approved by the PRC.

{11}   In the same application, SPS requested a financial incentive for which it proposed to exceed its twenty percent RPS obligation and meet the forty percent standard three years before it becomes mandatory as of 2025. Specifically, SPS proposed to retire enough RECs in 2022, 2023, and 2024 to meet 2025's forty percent standard in each of those years. In return, SPS requested a rate rider that would allow it to charge customers one dollar for each REC that it would retire over the twenty percent standard. If approved, SPS projected that it would collect from ratepayers the additional amounts of $1.65 million in 2022; $1.74 million in 2023; and $1.84 million in 2024, for a three-year total incentive of approximately $5.23 million. SPS represented that it would not retire "excess RECs early without an incentive to do so." SPS also maintained that retiring excess RECs to meet the 2025 standard "will necessitate that SPS procure more renewable energy resources earlier than would otherwise be needed in order to comply with the REA's [RPS]."

{12}   As a final part of the application, SPS requested a variance from the Amended Rule's requirement to demonstrate that the cost of retiring extra RECs would not

exceed "the demonstrable value of the corresponding reduction in carbon dioxide or other emissions." 17.9.572.22(D) NMAC (5/4/2021). Conceding that the proposal failed to meet that requirement, SPS argued that the requirement "is inconsistent with the REA" and therefore requested a variance.

{13} PRC Staff and three of the intervenors in the application proceeding[9] "vigorously contested" SPS's incentive proposal and variance request, both of which the PRC later denied in an order filed in December 2021. The PRC was careful to explain in the order that—although the request failed several provisions of the Amended Rule—the denial was not based on the rule's requirements. Rather, SPS failed to meet the threshold *statutory* requirement to qualify for an incentive: SPS "did not propose to 'produce or acquire' any renewable energy." Section 62-16-4(D). The PRC found that SPS introduced "no evidence of any firm plans to acquire or produce any additional renewable energy." Instead, "SPS only proposed to retire banked excess RECs earlier than it otherwise would [have]." That proposal was insufficient because, in the PRC's view, "the retirement of RECs is a paper exercise or method by which RPS compliance is demonstrated" and not a proposal to produce

[9]The three intervenors that opposed the incentive and variance were the New Mexico Large Customer Group, Occidental Permian Ltd. (Occidental), and Louisiana Energy Services. Having intervened in this appeal, these same parties filed a joint answer brief in support of the PRC's orders challenged by SPS.

10

or acquire renewable energy that exceeds the RPS "as required to be eligible for an incentive under the statute."

{14} In addition to finding failure under Section 62-16-4(D), the PRC separately concluded that SPS's incentive application failed to satisfy the provisions of the Amended Rule summarized above. Specifically, the PRC concluded that SPS's proposal did not merit an incentive because the RECs in question "are associated with . . . existing renewable energy facilities, all of which [1] pre-date Rule 572.22 (contrary to Rule 572.22.B) and [2] were acquired for reasons other than those contemplated in . . . Section 62-16-4(D) or Rule 572.22." *See* 17.9.572.22(B) NMAC (5/4/2021) (providing that an incentive "must be related to measures implemented by the utility *after the effective date of this rule*" (emphasis added)); 17.9.572.7(F) NMAC (5/4/2021) (defining "financial incentive" as "money or additional earnings . . . to encourage certain behaviors or actions *that would not otherwise have occurred* in order to further the outcomes described in Section 62-16-4" (emphasis added)). The request also failed the Amended Rule's requirement that the costs associated with retiring RECs must not exceed "the demonstrable value of the corresponding reduction in carbon dioxide or other emissions." 17.9.572.22(D) NMAC (5/4/2021). And as for SPS's requested variance from the latter requirement, the PRC denied the variance as moot because the incentive

11

request "failed on many other grounds." As previously noted however, these conclusions were ancillary to the PRC's determination that SPS's incentive request failed to produce or acquire renewable energy, as required by Section 62-16-4(D).

{15} SPS timely appealed from the order denying its incentive request, and we granted its subsequent motion to consolidate the appeal with its pending appeal challenging the Amended Rule. We now proceed to the merits of both appeals.

## II. DISCUSSION

{16} SPS's core objection to both the Amended Rule and the denial of its incentive request is the PRC's interpretation of Section 62-16-4(D) to preclude the award of an incentive for exceeding the RPS by retiring RECs earlier than required by the Act. Because our resolution of this issue effectively disposes of SPS's appeal by denial of its incentive application, we address it first. We then address SPS's many remaining arguments against the Amended Rule.[10] As the party challenging the PRC's orders, SPS has the burden of establishing that the orders are unreasonable or

---

[10]The presentation of the issues in this appeal provides a case study as to why the limitations the Legislature has placed on our review encourage trivial argument. *See* § 62-11-5 ("The supreme court shall have no power to modify the action or order appealed from, but shall either affirm or annul and vacate the same."). We caution parties that the better approach to advocacy is advancing only credible and discernible claims of error. Tossing in the kitchen sink with the hope of vacating an entire administrative ruling is an ill-conceived strategy that is wasteful of judicial resources.

unlawful. NMSA 1978, § 62-11-4 (1965); *see also*, *e.g.*, *Pub. Serv. Co. of N.M. v. N.M. Pub. Regul. Comm'n*, 2019-NMSC-012, ¶ 12, 444 P.3d 460 (observing that the party challenging the PRC's order has the burden of showing that the order was "arbitrary and capricious, not supported by substantial evidence, outside the scope of the agency's authority, or otherwise inconsistent with law." (internal quotation marks and citation omitted)).

**A.     The PRC's Denial of SPS's Incentive Application Under Section 62-16-4(D) Was Not Unreasonable or Unlawful**

{17}    SPS challenges the denial of its incentive application under Section 62-16-4(D) on three grounds. First, SPS argues that the PRC's interpretation of the statute "ignores the purpose and language of the REA and is consequently arbitrary and capricious, contrary to law, and an abuse of discretion." In particular, SPS argues that conditioning the award of an incentive on a proposal that would "produce or acquire renewable energy," § 62-16-4(D), "would lead to absurd results and thwart the Legislature's intent to incentivize utilities to exceed the RPS." Second, SPS argues that the availability of incentives under the REA since at least 2007 supports SPS's proposed reading of the statute. Third, SPS argues that the PRC lacked sufficient evidence to support the hearing examiner's finding of "speculative" that SPS's early retirement of extra RECs would result in acquiring additional renewable energy resources earlier than otherwise necessary. We address each argument in

13

turn, and because our resolution of these issues is sufficient to affirm, we decline to address SPS's additional arguments related to the denial of its incentive application.

**1.      The plain language of Section 62-16-4(D) conditions the award of an incentive on a proposal "to produce or acquire renewable energy"**

{18}     Whether the PRC erred by construing Section 62-16-4(D) to limit the award of incentives to proposals that would "produce or acquire renewable energy" presents a question of statutory interpretation, "which we review de novo." *N.M. Indus. Energy Consumers v. N.M. Pub. Regul. Comm'n*, 2007-NMSC-053, ¶ 19, 142 N.M. 533, 168 P.3d 105. "Where as here an agency is construing the same statutes by which it is governed, we accord some deference to the agency's interpretation," particularly for "legal questions that implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function." *Id.* (internal quotation marks and citation omitted). Nevertheless, we are "not bound by the agency's interpretation and may substitute [our] own independent judgment for that of the agency because it is the function of the courts to interpret the law." *Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 1995-NMSC-062, ¶ 11, 120 N.M. 579, 904 P.2d 28.

{19}     "When construing statutes, our guiding principle is to determine and give effect to legislative intent." *N.M. Indus. Energy Consumers*, 2007-NMSC-053, ¶ 20. We begin with "the plain meaning of the words at issue, often using the dictionary

14

for guidance." *N.M. Att'y. Gen. v. N.M. Pub. Regul. Comm'n*, 2013-NMSC-042, ¶ 26, 309 P.3d 89. We must give effect to the statute as written "without room for construction unless the language is doubtful, ambiguous, or . . . would lead to injustice, absurdity or contradiction, in which case the statute is to be construed according to its obvious spirit or reason." *Id.* (internal quotation marks and citation omitted).

{20} SPS does not argue that the PRC's interpretation of Section 62-16-4(D) is contrary to the statute's plain language—nor could it reasonably do so. The language and structure of the statute support the PRC's conclusion that Section 62-16-4(D) is "unequivocally clear" that an incentive must encourage a public utility, first and foremost, to "produce or acquire renewable energy." The statute is similarly clear on exceeding the RPS, the focus of SPS's argument, as a *secondary* objective that must be accomplished by the threshold requirement of producing or acquiring renewable energy. Under the statute's plain language, an incentive will be provided to encourage a public utility "to produce or acquire renewable energy that exceeds the applicable annual [RPS]" or that accomplishes one of the other secondary objectives listed in the statute. *See* § 62-16-4(D) (providing an incentive "to produce or acquire renewable energy" that reduces carbon emissions earlier than required or that reduces the coal-fired generation of electricity).

{21}    Instead of offering an alternative construction of Section 62-16-4(D), SPS argues that a literal interpretation "would lead to absurd results and thwart the Legislature's intent to incentivize utilities to exceed the RPS." SPS points to two other provisions to illustrate the purported absurdity that would result from a literal reading of Section 62-16-4(D): (1) the Legislature's finding that "a public utility should have incentives to go beyond the minimum requirements of the [RPS]," § 62-16-2(A)(5); and (2) the mandate that "[a] public utility shall meet the [RPS] . . . as demonstrated by its retirement of [RECs]," § 62-16-4(A). Based on these provisions, SPS insists that retiring RECs must be worthy of an incentive to exceed the RPS because retiring RECs is the only way to "establish compliance with the [RPS]." Section 62-16-5(A)(1); *see also* § 62-16-4(A). The SPS maintains that otherwise, "the Legislature chose to incentivize utilities to exceed the RPS but then failed to provide any mechanism for them to do so."

{22}    We will depart from a statute's literal meaning when the statute is shown to be ambiguous by "one or more provisions giving rise to genuine uncertainty as to what the legislature was trying to accomplish." *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 23, 117 N.M. 346, 871 P.2d 1352. We see no "genuine uncertainty" about the purpose or meaning of Section 62-16-4(D) in relation to the statute's plain language. To the contrary, providing an incentive to encourage a

16

public utility "to produce or acquire renewable energy" is entirely consistent with the overarching purpose of Section 62-16-4, particularly after the 2019 amendments to the REA.

{23}     As previously explained, Section 62-16-4(A) was amended in 2019 to mandate that public utilities keep pace with a series of increasing RPS benchmarks and make "[r]easonable and consistent progress" toward supplying one hundred percent of all retail sales of electricity in New Mexico from zero carbon resources by the year 2045. Section 62-16-4(A)(6). These demanding requirements signal a clear legislative intent to reduce and eliminate from the electricity provided to New Mexico public utility customers the use of any electricity generation resources that emit carbon dioxide into the atmosphere. Section 62-16-3(K) (defining a "zero carbon resource," in part, as "an electricity generation resource that emits *no* carbon dioxide into the atmosphere" (emphasis added)). As a necessary corollary, these requirements also signal an intent to compel public utilities to procure sufficient zero carbon resources to meet the zero carbon resource standard by 2045. Against this backdrop, an incentive clearly acts as a carrot "to encourage" a public utility to increase its renewable energy portfolio and reduce carbon dioxide and other harmful emissions faster than the REA requires. *See* § 62-16-4(D). Conditioning an incentive on a proposal that will produce or acquire renewable energy ensures that a proposed

17

measure will not qualify for an incentive unless, at minimum, it advances a utility's progress toward achieving the zero carbon resource standard. *Id.* In short, the statute's purpose supports and does not undermine its literal meaning.

{24}    To read Section 62-16-4(D) as SPS suggests would elevate form over substance. The act of retiring RECs alone does nothing to further the statute's objectives. SPS's proposal for an incentive illustrates the point. SPS characterized its proposal as a plan "to supply no less than 40% of [its] New Mexico retail energy sales [from renewable energy] three years early." But SPS's supporting documentation showed that in 2020, it actually generated and purchased renewable energy in an amount that was substantially equivalent to its RPS obligation—twenty percent of its retail electricity sales.[11] Section 62-16-4(A)(2) (setting forth an RPS of twenty percent, effective January 1, 2020). SPS also admitted that it was not proposing to produce or acquire additional renewable energy or renewable energy resources. Rather, SPS proposed only to retire *banked* RECs from its sizeable balance of RECs carried forward from renewable energy generated in previous

---

[11]SPS generated and purchased approximately 1.46 million MWh of renewable energy in 2020, which exceeded its RPS compliance requirement by approximately 4,910 MWh or 0.34%. Notably, at SPS's proposed incentive rate of $1 per MWh, its excess renewable energy for 2020 would have supported an incentive of $4,911, far less than the $1.65 million incentive that it requested for 2022.

years.[12] SPS's proposal thus would have done nothing to expand SPS's renewable energy portfolio or reduce carbon emissions during the three years that its requested incentive would have been in effect. We see nothing in the REA to suggest that the Legislature intended the award of an incentive under these circumstances. We therefore find no ambiguity that would lead us to ignore the plain meaning of Section 62-16-4(D), and we affirm the PRC's interpretation of the statute according to its plain language.

**2.      The availability of incentives under the REA since at least 2007 does not require the award of an incentive in this case**

{25}      We are similarly unpersuaded by SPS's argument that the availability of incentives under the REA since 2007 compels a different result. SPS offered testimony in support of its incentive application that "almost all renewable procurements on SPS's system were constructed before 2019 with the knowledge that SPS could be eligible for an incentive under the Act." This testimony reveals a basic misunderstanding of what the Legislature intended an incentive to accomplish.

---

[12]SPS has represented throughout this proceeding that, unless it receives an incentive to retire its banked RECs early, it has enough banked RECs to allow it to continue meeting its RPS obligations without procuring new renewable resources "until at least 2030." And even if it receives an incentive to retire RECs early, SPS estimates that it will remain compliant with its existing resources until some time between 2026 and 2029.

19

{26} Although the REA does not define the term incentive, common definitions describe it as something that "incites," "induces," "motivates," or "encourages" one to take action. *See, e.g.*, *Merriam-Webster Collegiate Dictionary* (11th ed. 2020), (defining "incentive" as "something that incites or has a tendency to incite to . . . action"); *New Oxford American Dictionary* (3d ed. 2010) (defining "incentive" as "a thing that motivates or encourages one to do something"); *American Heritage Dictionary* (5th ed. 2011) (defining "incentive" as "[s]omething, such as the fear of punishment or the expectation of reward, that induces action or motivates effort"). These definitions align closely with the plain language of Section 62-16-4(D), which provides that the PRC shall award an incentive "to *encourage* public utilities to produce or acquire renewable energy." (Emphasis added.)

{27} Given that one cannot encourage past behavior, the problem for SPS is simply a matter of timing. We agree that incentives have been available since at least 2007, and had SPS requested an incentive *before* it constructed the "renewable procurements" in question, it may well have qualified for an incentive to "encourage" the associated investments. Section 62-16-4(D); *see also* § 62-16-4(A)(4) (2007) (providing for an incentive to "encourage public utilities to acquire renewable energy supplies that exceed the applicable annual [RPS]"). But at this stage, SPS seeks a *reward*—not an incentive—for renewable resources or energy

that it already has produced or acquired beyond the REA's demands. Section 62-16-4(D) does not authorize the PRC to reward SPS's past behavior. Having failed to request an incentive before exceeding its obligations under the REA, SPS's actions vis-à-vis Section 62-16-4(D) were voluntary. Those actions do not support additional compensation from SPS's customers beyond the reasonable rate of return that SPS already has earned through the ratemaking process for the electricity associated with SPS's banked RECs.

**3.    Substantial evidence supports the PRC's finding that SPS did not propose to produce or acquire renewable energy to support its incentive request**

{28}    As a final point in our review of the denial of SPS's incentive application, we address SPS's argument that the PRC lacked substantial evidence to support the following finding:

> [T]he Commission concurs with the [Recommended Decision's] finding that it was speculative that SPS's early retirement of excess RECs would result in the early acquisition of resources to meet SPS's RPS in the future because there was no evidence of any firm plans to acquire or produce any additional renewable energy and because future acquisitions or procurements would only meet its RPS for compliance purposes, not exceed its RPS for the purposes required by the financial incentive statute.

SPS argues that the finding is unsupported because "SPS presented uncontroverted testimony that the proposed retirement of RECs to exceed the RPS in 2022 through

21

2024 would accelerate SPS's need to acquire additional resources by approximately two to four years."

{29} "[W]e will affirm the Commission's order if it is supported by substantial evidence, which is evidence that is credible in light of the whole record and that is sufficient for a reasonable mind to accept as adequate to support the conclusion reached by the agency." *Citizens for Fair Rates & the Env't v. N.M. Pub. Regul. Comm'n*, 2022-NMSC-010, ¶ 13, 503 P.3d 1138 (internal quotation marks and citation omitted)). We address SPS's substantial-evidence challenge only to the extent that it may implicate our conclusion that the PRC properly denied SPS's incentive application under Section 62-16-4(D) because SPS "did not propose to 'produce or acquire' any renewable energy." Our concern therefore is whether the PRC had substantial evidence to find that "there was no evidence of any firm plans to acquire or produce any additional renewable energy."

{30} As we have previously noted, SPS admitted at the hearing on its application that its incentive proposal did not include a "specific plan" to produce or acquire any additional renewable energy or renewable energy resources. The "uncontroverted testimony" cited by SPS does not suggest otherwise. It merely explains that, based on SPS's projections,

> if SPS continues to retire the minimal amount of RECs required to comply with the RPS, SPS is projecting compliance through 2030 to

beyond 2031 . . . . However, if SPS's plan to meet the 40% requirement three years early is approved, SPS is projecting compliance through 2026 and 2029. In other words, if SPS's plan is approved, SPS would be required to accelerate the acquisition of additional renewable resources to maintain RPS compliance.

This testimony underscores the PRC's finding that SPS did not actually propose to produce or acquire renewable energy, let alone renewable energy that would exceed the RPS as required for an incentive under Section 62-16-4(D); rather, SPS merely offered projections about when it would need to acquire "additional renewable resources to maintain RPS compliance" after expiration of SPS's incentive at the end of 2024. Based on our review, we hold that substantial evidence supports the PRC's finding that SPS did not propose to produce or acquire renewable energy to support its request for an incentive.

{31} In sum, with no proposal to produce or acquire renewable energy that exceeds the RPS, the PRC's denial of SPS's incentive application under Section 62-16-4(D) was neither unreasonable nor unlawful. Because we affirm the denial under the statute, we need not reach SPS's arguments that the PRC improperly denied the application under the various provisions of Rule 572.

**B.     The Amended Rule Is Not Unreasonable or Unlawful**

{32} We turn now to SPS's many challenges to the Amended Rule itself. SPS argues that various provisions of the Amended Rule exceed the scope of the REA,

23

are arbitrary and capricious and void for vagueness, and suffer from a litany of other legal and procedural deficiencies. After the completion of briefing the PRC filed a motion to dismiss as moot four of the issues raised by SPS in its appeal from the order approving the Amended Rule. The PRC argued that its subsequent order filed on December 7, 2022, which approved the Second Amended Rule after the instant appeals were filed, revised certain language in the Amended Rule that SPS had challenged in this appeal. We agree that three of SPS's arguments are moot, and we address those issues at the end of our analysis. But first, we consider SPS's arguments that are properly before us.

{33}     SPS brings a facial challenge to the rule and therefore must establish that the rule is invalid in all of its applications, not merely "under some specific set of circumstances." *Gila Res. Info. Project v. N.M. Water Quality Control Comm'n*, 2018-NMSC-025, ¶ 6, 417 P.3d 369 ("Petitioners must establish that no set of circumstances exist where the . . . [r]ule could be valid."); *see also Bounds v. State ex rel. D'Antonio*, 2013-NMSC-037, ¶ 14, 306 P.3d 457 ("In a facial challenge to a statute, we consider only the text of the statute itself, not its application." (brackets, internal quotation marks, and citation omitted)). We emphasize the point because many of SPS's arguments suffer from the lack of a factual record or any suggestion of an actual injury resulting from the application of the Amended Rule. *See Bounds*,

24

2013-NMSC-037, ¶ 13 ("[Where the petitioner] was unable to show any actual injury, . . . [he] was unable to pursue an as-applied challenge in which specific facts would be relevant and was left with only a facial challenge.").

**1.  The Amended Rule's cost-benefit requirement does not exceed the scope of the REA and is not otherwise unreasonable or unlawful**

{34}  SPS first challenges the cost-benefit requirement set forth in the Amended Rule, specifically Rule 572.22(D), which precludes the award of an incentive for a "particular investment if the cost of that investment exceeds the demonstrable value of the corresponding reduction in carbon dioxide or other emissions." SPS argues that the provision (1) ignores the scope of REA-authorized incentives by limiting incentives to investments that result in a reduction in carbon dioxide or other emissions when Section 62-16-4(D) also allows incentives for measures that exceed the RPS or reduce the coal-fired generation of electricity; (2) exceeds the scope of the REA by requiring a cost-benefit analysis that is not required under the REA; (3) is void for vagueness and arbitrary and capricious; and (4) was adopted without notice and comment in violation of due process.

**a.  Rule 572.22(D) does not preclude an incentive for measures that would exceed the RPS or reduce coal-fired electricity-generation**

{35}  SPS argues that Rule 572.22(D) limits incentives "only to investments that result in a reduction in carbon dioxide or other emissions" and effectively writes out

of existence the other two bases under Section 62-16-4(D) for earning an incentive, namely, exceeding the RPS and reducing the coal-fired generation of electricity.[13] This argument is overstated and does not withstand scrutiny.

{36} Despite SPS's repeated assertions to the contrary, Rule 572.22(D) does *not* necessarily preclude an incentive for measures that would exceed the RPS or reduce coal-fired generation. Like Section 62-16-4(D), Rule 572.22 expressly provides that a utility may seek an incentive for implementing measures "to accomplish *at least one* of the following purposes: (1) exceeding the public utility's annual RPS requirements; (2) reducing carbon dioxide emissions earlier than required by [the RPS]; or (3) reducing the generation of electricity by coal-fired generating facilities." *See* 17.9.572.22(A), (B) NMAC (5/4/2021) (emphasis added). The cost-benefit requirement ensures that an investment proposed to accomplish *any* of these purposes—including exceeding the RPS or reducing the coal-fired generation of electricity—is cost-effective relative to "the demonstrable value of the corresponding reduction in carbon dioxide or other emissions." 17.9.572.22(D) NMAC (5/4/2021). That the metric for measuring cost-effectiveness overlaps with the purpose of reducing carbon emissions does not *exclude* an incentive for

---

[13]The PRC argues that this issue is moot for largely semantic reasons, which we decline to address because we are unpersuaded by SPS's argument.

26

exceeding the RPS or reducing the coal-fired generation of electricity. Nor does the metric *guarantee* an incentive for reducing carbon emissions alone. The cost-benefit requirement applies equally to any of the purposes for earning an incentive.

{37} As a fallback to its categorical argument, SPS argues that the cost-benefit requirement "renders meaningless the provisions of the Rule that *purport* to allow incentives for exceeding the RPS or reducing coal-fired generation." (Emphasis added.) To illustrate the point, SPS provides the single example of biomass resources, which the Legislature included in the definition of a renewable energy resource that can be used to meet and exceed the RPS. *See* § 62-16-3(H)(3) (providing that biomass resources under the REA are "limited to agriculture or animal waste, small diameter timber, not to exceed eight inches, salt cedar and other phreatophyte or woody vegetation removed from river basins or watersheds in New Mexico"). SPS argues that Rule 572.22(D) precludes a utility from using biomass resources to earn an incentive for exceeding the RPS because "biomass fuel results in substantial carbon emissions and the increased use of biomass fuel to generate electricity would likely not result in a decrease in carbon emissions."

{38} This argument fails for at least two reasons. First, SPS's assertions about the "likely" carbon-related effects of biomass resources are not supported by the record and thus are merely the arguments of counsel and not evidence. *See, e.g.*, *State v.*

*Hall*, 2013-NMSC-001, ¶ 28, 294 P.3d 1235 ("It is not our practice to rely on assertions of counsel unaccompanied by support in the record." (internal quotation marks and citation omitted)). Second, SPS's assertions are contradicted by the REA itself, which has provided since 2019 that REC-eligible biomass resources must come from a facility certified to "have zero life cycle carbon emissions." Section 62-16-3(H)(3)(b). This lone example therefore does not establish that Rule 572.22(D)'s cost-benefit requirement precludes an incentive for exceeding the RPS, even when using biomass resources to do so. To the contrary, any measure that otherwise qualifies for an incentive can satisfy Rule 572.22(D)—as long as the cost would be less than the value of the corresponding reduction in carbon dioxide or other emissions.[14] We thus disagree that Rule 572.22(D) exceeds the scope of the REA by limiting incentives only to investments that would result in a reduction of carbon dioxide or other emissions.

---

[14]We also note that, although this is a facial challenge, SPS's evidence to support its own incentive request similarly failed to show that Rule 572.22(D) precludes the award of an incentive for SPS's proposal for an incentive. Although SPS admitted that the cost of retiring extra RECs would be greater than the value of the corresponding reduction in carbon dioxide or other emissions, it also volunteered that it had declined to use a different methodology that "could have generated a better result for the cost-benefit analysis required by the rule." Thus, SPS's own evidence was inconclusive about whether Rule 572.22(D) "renders meaningless the provisions of the REA that allow incentives for exceeding the RPS."

**b.      Rule 572.22(D) is a reasonable exercise of the PRC's overarching duties under the Public Utility Act**

{39}      SPS next argues that Rule 572.22(D) exceeds the scope of the REA by requiring a cost-benefit analysis that is not explicitly required by statute. SPS argues that, because the REA expressly includes a cost-benefit analysis for measures taken to meet the 2040 and 2045 RPS levels of eighty percent and one hundred percent, the exclusion of such an analysis for complying with earlier RPS requirements was purposeful, such that Rule 572.22(D) is contrary to legislative intent. *See* § 62-16-4(B)(3) ("In administering the [eighty percent and one hundred percent RPS standards], the commission shall . . . prevent unreasonable impacts to customer electricity bills, taking into consideration the economic and environmental costs and benefits of renewable energy resources and zero carbon resources . . . .").

{40}      We are not persuaded. This argument fails to consider Rule 572.22(D) in the context of both the REA and the PRC's broader regulatory duties. *Cf. Baker v. Hedstrom*, 2013-NMSC-043, ¶ 15, 309 P.3d 1047 ("We must examine [the plaintiffs'] interpretation in the context of the statute as a whole, including the purposes and consequences of the . . . Act."). The PRC adopted Rule 572.22 pursuant to its statutory duty to "promulgate rules to implement the provisions of the [REA]," § 62-16-9, including "to develop and provide financial or other incentives to encourage public utilities to" carry out the purposes of the REA, § 62-16-4(D).

29

*See also* § 62-16-7(A)(1) (providing that the PRC "shall adopt rules regarding the [RPS]"). However, the REA provides minimal guidance for determining whether a requested incentive may be justified, leaving the PRC to apply its broad policy-making authority and expertise to fill in the legislative gaps to effectuate the purposes of the REA. *See, e.g.*, *New Energy Econ., Inc. v. N.M. Pub Reg. Comm'n*, 2018-NMSC-024, ¶ 25, 416 P.3d 277 ("[I]f it is clear that our Legislature delegated to the PRC (either explicitly or implicitly) the task of giving meaning to interpretive gaps in a statute, we will defer to the PRC's construction of the statute as the PRC has been delegated policy-making authority and possesses the expertise necessary to make sound policy."). Under these circumstances, the PRC necessarily falls back on its overarching duty to regulate public utilities in a manner that balances the interests of the public, consumers, and investors to ensure "that reasonable and proper services shall be available at fair, just and reasonable rates." NMSA 1978, § 62-3-1 (B) (2008); *see also* NMSA 1978, § 62-8-1 (1941) ("Every rate made, demanded or received by any public utility shall be just and reasonable."); *cf.* § 62-16-2(A)(4) ("[P]ublic utilities should be able to recover their reasonable costs incurred to procure or generate energy from renewable energy resources . . . .").

{41}     Against this backdrop, Rule 572.22 first ensures that any incentive awarded under the REA will comply with the statute by encouraging a utility to produce or

30

acquire renewable energy that accomplishes one or more of the REA's statutory bases for an incentive. *See* 17.9.572.22(A), (B) NMAC (5/4/2021); *see also* § 62-16-4(D). The utility then must demonstrate "that the terms and duration of the proposed incentive . . . are just and reasonable in light of the utility's costs, its authorized return, and the magnitude of any other incentives that have been authorized by the commission." 17.9.572.22(C) NMAC (5/4/2021). The utility also must show that the measure proposed to support the incentive will be a cost-effective investment as compared with the "value of the corresponding reduction in carbon dioxide or other emissions." 17.9.572.22(D) NMAC (5/4/2021).

{42} This framework implements the REA's incentive and rulemaking requirements in a manner that comports with the PRC's broad mandate to regulate public utilities to ensure "that reasonable and proper services shall be available at fair, just and reasonable rates." Section 62-3-1(B). Given that an incentive will compensate a utility at the expense of ratepayers, we hold that the PRC acted within its authority by requiring an incentive to be just and reasonable and based on a cost-effective investment. *Cf. Att'y Gen. v. N.M. Pub. Regul. Comm'n*, 2011-NMSC-034, ¶¶ 11, 13, 150 N.M. 174, 258 P.3d 453 (concluding that an "adder" that allows a utility to "receive additional revenue as compensation for reducing the consumption of their energy" is a rate and therefore requires a balancing of interests to ensure that

31

it is "'just and reasonable'" (quoting Section 62-8-1)). Moreover, we defer to the PRC's chosen standard for evaluating the cost-effectiveness of an investment—the cost of the investment versus the value of the corresponding reduction of carbon dioxide or other emissions—as a reasonable exercise of policy-making authority that promotes the legislative directive to make "[r]easonable and consistent progress" toward reaching the zero carbon resource standard by 2045. Section 62-16-4(A)(6); *see also New Energy Econ.*, 2018-NMSC-024, ¶ 25.

{43} The cases cited by SPS do not compel a different conclusion. In particular, SPS cites *State ex rel. Sandel v. N.M. Pub. Util. Comm'n*, 1999-NMSC-019, ¶ 26, 127 N.M. 272, 980 P.2d 55, to argue that the PRC "usurp[ed] the Legislature's law-making and policy-setting authority" by adopting Rule 572.22(D). We held in *Sandel* that the PRC's predecessor, the Public Utility Commission, violated Article III, Section 1 of the New Mexico Constitution "by undertaking to deregulate the electric power industry in New Mexico in a manner that is beyond the scope of the authority granted . . . by the Legislature." *Sandel*, 1999-NMSC-019, ¶ 26. We reached that conclusion based on the Commission's actions to "carry out broad changes in public policy by replacing regulation under the 'just and reasonable' standard with competition in an open marketplace," *id.* ¶ 19, at a time when deregulation was being debated at both the state and federal levels, *id.* ¶ 8. Here, the

PRC has not attempted a controversial change in public policy vis-à-vis its fundamental responsibility to ensure just and reasonable rates. Rather, the PRC has adopted a rule that implements the REA's incentive provision, consistent with the PRC's traditional exercise of its regulatory authority. *Sandel* is thus inapposite.

{44}     In sum, the PRC must carry out its duty to establish just and reasonable rates absent a clear statement to the contrary. *See, e.g.*, *Hobbs Gas Co. v. N.M. Pub. Serv. Comm'n*, 1980-NMSC-005, ¶ 4, 94 N.M. 731, 616 P.2d 1116 ("The law . . . charges the Commission with the responsibility of [e]nsuring that every rate made or received by a public utility shall be just and reasonable."). The cost-benefit analysis requirement in Section 62-16-4(B)(3) does not relieve the PRC from ensuring that an incentive awarded at ratepayers' expense is just and reasonable. To the contrary, it mandates that the PRC consider "*unreasonable* impacts to customer electricity bills" in achieving the 2040 and 2045 RPS standards. *Id.* (emphasis added). That mandate is broad enough to encompass a cost-benefit requirement that precludes the award of an incentive unless the utility demonstrates a benefit to ratepayers that ensures progress toward the zero carbon resource standard.

**c.     SPS's remaining challenges to Rule 572.22(D) fail**

{45}     SPS's two remaining challenges to Rule 572.22(D) also fail. First, SPS argues that the cost-benefit provision in Rule 572.22(D) was adopted without notice and

comment, in violation of due process. We readily dispense with this argument. The PRC's Notice of Proposed Rulemaking included a draft of proposed Rule 572.22 that "request[ed] that all comments include a proposal on how best to calculate a financial incentive." SPS proposed a method of calculating a financial incentive that the PRC ultimately declined to adopt. Instead, the PRC adopted the cost-benefit requirement that was proposed by Occidental Permian Limited, Ltd. (Occidental) in its initial comment to the proposed rule. Significantly, SPS submitted a written comment on Occidental's proposed requirement, stating that it "is an ambiguous, arbitrary, and capricious limitation found nowhere in the statute." SPS thus had notice that the PRC was considering a method of calculating a financial incentive, had an opportunity to propose its own method, and had an opportunity to comment on the very language that the PRC eventually adopted. Under these circumstances, SPS's claimed due process violation rings hollow. *See, e.g.*, *Rivas v. Bd. of Cosmetologists*, 1984-NMSC-076, ¶ 9, 101 N.M. 592, 686 P.2d 934 ("Case law suggests that the minimum protections upon which administrative action may be based, [are] according to interested parties a simple notice and right to comment." (alteration in original) (internal quotation marks and citation omitted)).

{46}     Second, SPS argues that Rule 572.22(D) provisions for calculating the costs and benefits supporting an incentive application are void for vagueness. In

34

particular, SPS challenges the requirement to provide "the cost of the measures implemented by the utility that resulted in the lower carbon dioxide emissions." 17.9.572.22(D)(4) NMAC (5/4/2021). SPS similarly challenges the requirement to provide "the estimated value of the reduction in carbon dioxide emissions . . . based on an analysis of relevant carbon dioxide markets." 17.9.572.22(D)(3) NMAC (5/4/2021). SPS argues that, without greater specificity, the rule "requires utilities to guess at its meaning and is impermissibly vague." We disagree. "A court entertaining a pre-enforcement challenge to a regulation that does not implicate constitutionally protected conduct such as the First Amendment right to freedom of expression may sustain a vagueness challenge only if the law 'is impermissibly vague in all of its applications.'" *N.M. Petroleum Marketers Ass'n v. N.M. Env't Improvement Bd.*, 2007-NMCA-060, ¶ 16, 141 N.M. 678, 160 P.3d 587 (quoting *Vill. of Hoffman Ests. v. The Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982)). Here, by SPS's own account, it understood Rule 572.22(D) well enough to submit "all the information required by that subsection" to support its proposal for an incentive. SPS's ability to comprehend the rule's requirements undermines its argument that the rule "is impermissibly vague in all of its applications."

## 2. SPS's void-for-vagueness challenges lack merit

{47} Continuing with the void-for-vagueness theme, SPS challenges three other provisions of Rule 572 on vagueness grounds. First, SPS argues that the rule's definition of the term "financial incentive" is unconstitutionally vague. *See* 17.9.572.7(F) NMAC (5/4/2021). SPS maintains that the definition's use of the terms "capital investment opportunities," "certain behaviors or actions," and "would not otherwise have occurred" are confusing, ambiguous, and require utilities to guess at their meanings. Second, SPS argues that the definition of "procure" and "procurement" is ambiguous "to the extent it does not comport with the Amended Rule's actual use of the term 'procurement.'" *See* 17.9.572.7(P)(4) NMAC (5/4/2021). SPS argues that the Amended Rule "defines procurement to mean a bidding process, but the rule subsequently uses the term to refer to the cost of the generation purchased rather than the bidding process itself" and then cites, as an example, "17.9.572.12(C) NMAC (5/4/2021) ('To the extent a procurement is greater than the reasonable cost threshold and results in excess costs . . . .')." SPS argues that the actual use of the term procurement relative to the definition provided in the rule is "inconsistent and confusing" and "renders the definition vague and unenforceable." Third, SPS challenges the provision that requires a public utility to give a preference to renewable energy generated in New Mexico in limited

36

circumstances. *See* 17.9.572.10(A) NMAC (5/4/2021) ("Other factors being equal, preference shall be given to renewable energy generated in New Mexico."). SPS argues that the requirement for a preference when "[o]ther factors [are] equal" fails to identify what those factors may be and as such, the provision requires utilities to guess at its meaning and is impermissibly vague. *See id.*

{48} Although these provisions have not been drafted with perfect clarity, they are sufficient for due process purposes. As our Court of Appeals has cogently explained, "An agency drafting regulations is not required to write for the benefit of deliberately unsympathetic or willfully obtuse readers: for purposes of due process, a governmental agency attempting to give notice to members of the public may assume a hypothetical recipient desirous of actually being informed." *N.M. Petroleum Marketers*, 2007-NMCA-060, ¶ 18 (internal quotation marks and citation omitted). Here, SPS objects to language that readily informs a public utility about the PRC's intended meaning. SPS itself was able to understand the PRC's intended meaning and was able to apply the first two provisions it challenges—*financial incentives* and *procurements*—in its incentive application without difficulty. We are thus unpersuaded that the challenged provisions are "impermissibly vague in all of [their] applications." *Id.*

37

### 3. The Amended Rule's preference for renewable energy generated in New Mexico is not unlawful

**{49}** SPS challenges the Amended Rule's preference for renewable energy generated in New Mexico, 17.9.572.10(A) NMAC (5/4/2021), as (1) exceeding the scope of the REA, (2) unlawfully discriminating against citizens of other states in violation of the Privileges and Immunities Clause, U.S. Const, art. IV, § 2, cl. 1, and (3) violating the dormant Commerce Clause, U.S. Const. art. I, § 8, cl. 3.

**{50}** As for exceeding the scope of the REA, we reiterate that the PRC is not precluded from exceeding the REA's requirements on matters of public policy specifically entrusted to the PRC's discretion and expertise. *See New Energy Econ.*, 2018-NMSC-024, ¶ 25. The REA directs the PRC to promulgate rules to implement the Act and its objectives, § 62-16-9, including rules to implement the legislative finding that "the use of renewable energy by public utilities subject to commission oversight in accordance with the [REA] can bring significant economic benefits to New Mexico," § 62-16-2(A)(2). Stating, in 17.9.572.10(A) NMAC (5/4/2021), a narrow preference for renewable energy generated in New Mexico—in the unlikely circumstance of "[o]ther factors being equal"—is a reasonable exercise of the PRC's mandate to implement the Act in a manner that is economically beneficial to New Mexico when lawful and appropriate.

{51} Turning to SPS's unlawful discrimination argument, we note that this argument is largely undeveloped and is not supported by SPS's lone citation of *United Building & Construction Trades Council v. Mayor & Council of City of Camden*, 465 U.S. 208 (1984). Unlike the requirement in *United Building* that at least forty percent of the employees of city contractors and subcontractors must be local residents, *see id.* at 210, the Amended Rule's preference does not require any of a utility's renewable energy to be generated in New Mexico. "Other factors being equal," 17.9.572.10(A) NMAC (5/4/2021), the preference merely acts as a tie-breaker. SPS cites no authority that such a tie-breaker amounts to unlawful discrimination against the citizens of other states under the Privileges and Immunities Clause, and we therefore assume that none exists. *See Lee v. Lee* (*In re Doe*), 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 ("We assume where arguments in briefs are unsupported by cited authority, counsel after diligent search, was unable to find any supporting authority.").

{52} That the challenged preference is a mere tie-breaker also distinguishes it from the cases cited by SPS in support of its similarly undeveloped argument under the dormant Commerce Clause. *See Wyoming v. Oklahoma*, 502 U.S. 437, 440-41, 461 (1992) (holding that the Commerce Clause was violated by a statute requiring ten percent of coal burned in Oklahoma power plants to be mined in-state); *New England*

39

*Power Co. v. New Hampshire*, 455 U.S. 331, 339, 344 (1982) (holding that the Commerce Clause was violated by an order prohibiting a utility from selling hydroelectric energy outside the State of New Hampshire); *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273, 280 (1988) (holding that the Commerce Clause was violated by a statute awarding tax credits to ethanol producers only if the ethanol was produced in Ohio or in a state that granted similar tax advantages to ethanol produced in Ohio). Unlike the statutes in those cases, the Amended Rule's preference neither discriminates against interstate commerce nor imposes a burden on such commerce that "is clearly excessive in relation to the putative local benefits." *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Again, SPS cites no authority that a mere tie-breaker discriminates against or unlawfully burdens interstate commerce. Assuming no such authority exists, we conclude that the Amended Rule's preference is not unreasonable or unlawful. *See In re Doe*, 1984-NMSC-024, ¶ 2.

**4.      Rule 572.22(E) does not exceed the scope of the REA by including a cost cap on incentives**

{53}     SPS argues that the Amended Rule's cost cap on incentives exceeds the scope of the REA. Specifically, SPS challenges Rule 572.22(E), which provides, "The total financial incentive authorized for recovery in rates pursuant to this section shall not exceed the product (expressed in dollars) of: (1) the utility's annual weighted

40

average cost of capital (expressed as a percent)[] and (2) the cost of the measures described in Subsection B of this section." 17.9.572.22(E) NMAC (5/4/2021). SPS argues that this cap unduly limits the availability of incentives beyond the lone cost cap actually established in the statute, which "protect[s] public utilities and their ratepayers from renewable energy costs that are above a reasonable cost threshold." Section 62-16-2(B)(3); *see also* § 62-16-3(E) (establishing a reasonable cost threshold of $60 per megawatt-hour of renewable energy with adjustments for inflation after 2020).

{54}    As an initial matter, we note that the challenged provision does not establish a cap at all; rather, it ensures that any incentive is cost-based and justly and reasonably related to a utility's approved weighted average percentage cost of capital. *See, e.g.*, *N.M. Att'y Gen.*, 2011-NMSC-034, ¶ 18 (holding that the adoption of rates was "arbitrary and unlawful in that they were not evidence-based, cost-based, nor utility specific"). We further note that SPS proposed an arbitrary incentive cap of $10 million in its initial comments to the proposed rule as part of its proposed method of calculating a financial incentive. SPS never withdrew its proposed cap or otherwise alerted the PRC to the argument that it raises on appeal. We therefore decline to address this argument further.

**5.    Rule 572.11 does not unreasonably or unlawfully restrict the application of the REA**

{55} SPS next challenges the PRC's adoption of Rule 572.11 as unreasonable and unlawful. Rule 572.11 codifies one of the seven requirements set forth in Section 62-16-4(B) that govern how the PRC shall administer the eighty percent and one hundred percent RPS requirements. Specifically, Rule 572.11 codifies the requirement that the PRC shall, "in consultation with the department of environment, ensure that the standard does not result in material increases to greenhouse gas emissions from entities not subject to commission oversight and regulation." Section 62-16-4(B)(6); *see* 17.9.572.11 NMAC (5/4/2021) ("After consultation with the department of environment, the commission may not approve a public utility's annual [REA] plan that result[s] in material increases to greenhouse gas emissions from entities not subject to commission oversight and regulation."). SPS argues that, because the PRC did not codify the other six requirements set forth in the statute, the Amended Rule "selectively implement[s] the REA" and "limit[s] the application of [the REA] through the adoption of a regulation." Intervenors, in their Joint Answer Brief, agree that the PRC's "unexplained inclusion of one consideration in Section 62-16-4(B) and exclusion of the remainder is unreasonable and should be annulled and vacated."

{56} We disagree with the position of SPS and Intervenors that the PRC's inclusion of only one of the requirements set forth in Section 62-16-4(B) requires annulling

42

and vacating the order approving the Amended Rule. Neither SPS nor Intervenors cite authority requiring the PRC to take an all-or-nothing approach to codifying multiple requirements set forth in a single, relevant statute. We therefore assume that no such authority exists. *See In re Doe*, 1984-NMSC-024, ¶ 2 ("Issues raised in appellate briefs which are unsupported by cited authority will not be reviewed by us on appeal."). Moreover, the Amended Rule's language does not contradict or otherwise conflict with the substantially identical language in the statute and does not relieve the PRC from the remainder of its duties under the statute. *Cf.* NMSA 1978, § 14-4-5.7(A) (2017) ("A conflict between a rule and a statute is resolved in favor of the statute.").

**6.     The PRC did not act unreasonably or unlawfully by "adopting the Amended Rule after it bifurcated critical matters from the rulemaking"**

{57}    SPS argues that the PRC acted arbitrarily and capriciously when it "bifurcated critical matters from the rulemaking" and it "transfer[ed] controversial issues to a separate rulemaking and subject[ed] utilities to a confusing, ambiguous, and vague rule." Specifically, SPS contends that the PRC lacked authority to adopt the Amended Rule without addressing (1) the definition of the phrase "capital investment opportunities" in the definition of financial incentive, (2) whether a financial incentive would be available to advance the closure of the four corners nuclear facility, (3) whether the one hundred percent zero carbon standard includes

43

the 2040 RPS standard of eighty percent renewables and limits nuclear to twenty percent, (4) whether Arizona Public Service could apply for a financial incentive as a nonregulated entity for the four corners nuclear facility, and (5) how the "average annual levelized cost" of energy should be calculated for purposes of the reasonable cost threshold definition set forth in Section 62-16-3(E).

{58} The lone authority that SPS cites in support of this argument is a federal district court case that granted a preliminary injunction against the implementation of a rule that was adopted through a "staggered rulemaking" process. *See Centro Legal de la Raza v. Exec. Off. for Immigr. Rev.*, 524 F. Supp. 3d 919, 954-55 (N.D. Cal. 2021). The circumstances of *Centro Legal de la Raza* are clearly distinguishable. In particular, the rulemaking in this case and the subsequent rulemaking that resulted in the Second Amended Rule were held in a sequential, orderly manner with full public notice of both proceedings and ample opportunity for public participation. *Contra id.* at 958 (holding that the agency's rushed and overlapping rulemakings and decisions "deprived the public of the opportunity to consider how these rules intersected and impacted the Rule, and also raise[d] serious questions about whether the agency meaningfully addressed the interaction of these rules." (internal quotation marks and citation omitted)). SPS's contention does not withstand scrutiny.

**7.      SPS's remaining arguments are moot**

**a.      A reasonable cost threshold analysis is not required for existing procurements**

{59}      SPS challenges the provision of the Amended Rule that implemented the REA's "reasonable cost threshold" (RCT) of sixty dollars per megawatt-hour that was established by the Legislature in 2019. *See* § 62-16-4(E) (providing that a "public utility shall not be required to incur" costs above the RCT to procure or generate renewable energy to comply with the RPS); § 62-16-3(E) (defining "reasonable cost threshold"). SPS argues that the Amended Rule's requirement to include an RCT analysis for *existing* renewable energy procurements applies the RCT retroactively and is therefore unlawful. *See* 17.9.572.12(B) NMAC (5/4/2021) (providing that a public utility "shall include in its annual [REA] plan [an RCT] analysis by procurement, *existing or proposed*, for the plan year" (emphasis added)); *see also, e.g.*, *Howell v. Heim*, 1994-NMSC-103, ¶ 17, 118 N.M. 500, 882 P.2d 541 ("New Mexico law presumes that statutes and rules apply prospectively absent a clear intention to the contrary."). However, the Second Amended Rule removed the reference to "existing" procurements and now requires an RCT analysis only for "proposed" procurements. *Compare* 17.9.572.12(A) NMAC (2/28/2023) *with* 17.9.572.12(B) NMAC (5/4/2021). And as we have already determined, the PRC denied SPS's incentive application under Section 62-16-4(D) and did not rely on

45

Rule 572.12(B). A ruling on this issue therefore would not "grant actual relief," and accordingly the issue is moot. *Gunaji v. Macias*, 2001-NMSC-028, ¶ 9, 130 N.M. 734, 31 P.3d 1008 (internal quotation marks and citation omitted); *see also KOB-TV, L.L.C. v. City of Albuquerque*, 2005-NMCA-049, ¶ 37, 137 N.M. 388, 111 P.3d 708 ("[W]hen legislation is enacted that resolves a conflict, a question concerning the conflict addressed to a court will be moot.").

**b.      The typographical error in Rule 572.12(C) has been corrected**

{60}      SPS argues that the order approving the Amended Rule must be vacated and annulled because of a typographical error in the Amended Rule that "states the exact opposite of the REA." *Compare* § 62-16-4(E) ("The provisions of this subsection *do not preclude* a public utility from accepting a project with a cost that would exceed the [RCT]." (emphasis added)) *with* 17.9.572.12(C) NMAC (5/4/2021) ("The provisions of this rule *do preclude* a public utility from accepting a project with a cost that would exceed the [RCT]." (emphasis added)). However, the Second Amended Rule corrected the error such that the current rule is now consistent with the statute. *See* 17.9.572.12(B) NMAC (2/28/2023). Nonetheless, SPS continues to press the issue because the PRC denied SPS's incentive application based on the "flawed rule." We disagree. The PRC reasonably and lawfully denied SPS's incentive application irrespective of the Amended Rule's "flawed" RCT provision,

46

which has now been corrected. This issue is therefore moot. *See Gunaji*, 2001-NMSC-028, ¶ 9; *KOB-TV*, 2005-NMCA-049, ¶ 37.

**c.    No controversy exists about whether the Amended Rule requires a new competitive selection process for existing resources**

{61}    SPS challenges the Amended Rule's provision implementing a new competitive bidding requirement established by the 2019 amendments to the REA that applies to procurements for "new renewable energy" beginning on July 1, 2020. *See* 17.9.572.13 NMAC (5/4/2021); *see also* § 62-16-4(G)(1), (3). SPS argues, "*To the extent* the rule allows for application of the competitive procurement requirement to existing, previously approved resources, it is inconsistent with the REA." (Emphasis added.) The PRC agrees that the competitive procurement requirement does not apply to "previously approved procurements" and maintains that neither the Amended Rule nor the Second Amended Rule provides otherwise. *See* 17.9.572.13 NMAC (5/4/2021 & 2/28/2023). We see no actual controversy on this issue. We agree with the parties that Section 62-16-4(F) and (G) impose distinct and different requirements on renewable-energy procurements proposed before and after July 1, 2020—with only the latter subject to a competitive procurement process. The Amended Rule does not provide to the contrary and does not require us to disturb the order adopting the Amended Rule. *See, e.g.*, *Tenneco Oil Co. v. N.M. Water Quality Control Comm'n*, 1987-NMCA-153, ¶ 14, 107 N.M. 469, 760 P.2d 161

47

("Rules and regulations enacted by an agency are presumed valid and will be upheld if reasonably consistent with the statutes that they implement."), *superseded by statute on other grounds as stated in N.M. Mining Ass'n v. N.M. Water Quality Control Comm'n*, 2007-NMCA-010, ¶ 19, 141 N.M. 41, 150 P.3d 991.

## III.  CONCLUSION

{62}   SPS has failed to meet its burden to show that the PRC's orders adopting the Amended Rule and denying SPS's 2021 request for a financial incentive were unreasonable or unlawful. We therefore affirm both orders.

{63}   **IT IS SO ORDERED.**

**DAVID K. THOMSON, Justice**

**WE CONCUR:**

**C. SHANNON BACON, Chief Justice**

**MICHAEL E. VIGIL, Justice**

**JULIE J. VARGAS, Justice**

**BRIANA H. ZAMORA, Justice**

48